**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MERRILEE DIRICKSON, | ) | Case No. 19-cv-07149 |
| | ) | |
| Plaintiff, | ) | Judge Mary Rowland |
| | ) | |
| v. | ) | Magistrate Judge Gabriel A. Fuentes |
| | ) | |
| INTUITIVE SURGICAL, INC., | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

I.      Statement of Facts……………………………………………………………1

II.     Legal Standard……………………………………………………………… 7

III.    Plaintiff's Gender Discrimination Claim Should Be Decided By A Jury………………...8

      A.      Plaintiff Does Not Rely On *McDonnell Douglas*
            Burden-Shifting Framework……………………………………………8

      B.      A Jury Could Readily Conclude Defendant Engaged
            In Sex Discrimination …………………………………………………… 8

            1.   Defendant's Culture Of Discriminating
                 And Retaliating Against Women……………………………………...9

            2.   Defendant's Culture Of Protecting Men
                 Who Mistreat Women ……………………………………………10

            3.   Defendant's Comments, Conduct, And Differential Treatment…………….11

            4.   Dishonest Justifications For Disparate Treatment / Pretext…………………12

      C.      Defendant Subjected Plaintiff To Adverse Actions
            Beyond Her Termination……………………………………………...14

      D.      Plaintiff's Hostile Work Environment Claim
            Should Be Decided By A Jury …………………………………………15

IV.     Plaintiff's Retaliation Claim Survives Summary Judgment………………………….17

      A.      Asserting Baseless Legal Claims Is An Adverse Action …………………………18

      B.      Plaintiff Was Subjected To Other Adverse Actions
            Beyond Her Termination …………………………………………………20

      C.      Direct Evidence Of Retaliatory Motive And Causal Link…………………………21

            1.   Direct Evidence Of Defendant's Retaliatory Motive………………………...22

            2.   Circumstantial Evidence ……………………………………………24

V.      Defendant Fired Plaintiff In Violation Of Illinois Law …………………………….26

      A.      Plaintiff's Common Law Retaliatory Discharge Claim ………………………….26

      B.      Plaintiff's Statutory Claim Under The Illinois Whistleblower Act……………...27

VI.    Defendant And Its Lawyers Should Be Sanctioned………………………………...27

VII.   Conclusion……………………………………………………………………………28

# TABLE OF AUTHORITIES

## CASES

*Anaya v. Birck,*
2022 U.S. Dist. LEXIS 87066 (N.D. Ill. May 13, 2022) .................................................. 9

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ......................................................................................................... 7

*Bagwe v. Sedgwick Claims Mgmt. Servs.,*
811 F.3d 866 (7th Cir. 2016) ........................................................................................ 15

*Beers v. E.R. Wagner Mfg. Co.,*
2013 U.S. Dist. LEXIS 54376 (N.D. Ill. Apr. 17, 2013) .............................................. 27

*Bell v. E.P.A.,*
232 F.3d 546 (7th Cir. 2000) ........................................................................................ 10

*Benders v. Bellows & Bellows,*
515 F.3d 757 (7th Cir. 2008) ........................................................................................ 22

*Bentivegna v. People's United Bank,*
2017 U.S. Dist. LEXIS 156445 (E.D.N.Y. Sep. 25, 2017) ............................................ 19

*Bob-Maunuel v. Chipotle Mexican Grill, Inc.,*
10 F. Supp. 3d 854 (N.D. Ill. 2014) .............................................................................. 25

*Boss v. Castro,*
816 F.3d 910 (7th Cir. 2016) ........................................................................................ 14

*Brown v. Chi. Transit Auth.,*
2020 U.S. Dist. LEXIS 27222 (N.D. Ill. Feb. 14, 2020) .................................. 8, 17, 21

*Burlington N. & Santa Fe Ry. v. White,*
548 U.S. 53 (2006) .................................................................................................. 18, 20

*Chaudhry v. Nucor Steel-Indiana,*
546 F.3d 832 (7th Cir. 2008) ........................................................................................ 14

*Coleman v. Donahoe,*
667 F.3d 835 (7th Cir. 2012) ........................................................................................ 22

*Collins v. Village of Woodbridge*,
96 F. Supp. 2d. 744 (N.D. Ill. 2000) .......................................................................... 25

*Culver v. Gorman & Co.*,
 416 F.3d 540 (7th Cir. 2005) ..................................................................................... 7

*Curtis v. City of Chi.*,
2019 U.S. Dist. LEXIS 135228 (N.D. Ill. Aug. 12, 2019)........................................... 21

*Dunn v. Hamra Enters.*,
2022 U.S. Dist. LEXIS 168121 (N.D. Ill. Sep. 16, 2022) ................................. 13, 14, 26

*EEOC v. Costco Wholesale Corp.*,
903 F.3d 618 (7th Cir. 2018) .................................................................................... 17

*EEOC v. Virginia Carolina Veneer Corp.*,
495 F.Supp. 775 (W.D. Va. 1980) .............................................................................. 20

*Flanagan v. Office of the Chief Judge*,
2007 U.S. Dist. LEXIS 75208 (N.D. Ill. Sep. 28, 2007) ....................................... 21, 25

*Geier v. Medtronic, Inc.*,
99 F.3d 238 (7th Cir. 1996) ...................................................................................... 19

*Greengrass v. Int'l Monetary Sys., Ltd.*,
 776 F.3d 481 (7th Cir. 2015) .................................................................................... 21

*Haugerud v. Amery Sch. Dist.*,
259 F.3d 678 (7th Cir. 2001) .................................................................................... 16

*Henderson v. Shulkin*,
720 F. App'x 776 (7th Cir. 2017) .............................................................................. 10

*Hicks v. Forest Preserve Dist.*,
677 F.3d 781 (7th Cir. 2012) .................................................................................... 23

*Hildebrandt v. Ill. Dep't of Nat. Res.*,
347 F.3d 1014 (7th Cir. 2003) .................................................................................. 15

*Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*,
804 F.3d 826 (7th Cir. 2015) .................................................................................... 21

*Ishkhanian v. Forrester Clinic S.C.,*
2003 U.S. Dist. LEXIS 11041 (N.D. Ill. June 25, 2003) ............................................ 18

*Joll v. Valparaiso Cmty. Sch.,*
953 F.3d 923 (7th Cir. 2020) .................................................................... 8, 9, 11

*King v. Preferred Technical Grp.,*
166 F.3d 887 (7th Cir. 1999) ................................................................................ 21

*Leghari v. Wilkie,*
2022 U.S. Dist. LEXIS 153950 (N.D. Ind. Aug. 25, 2022) .................................. 14

*Lewis v. Wilkie,*
909 F.3d 858 (7th Cir. 2018) ................................................................................ 17

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,*
263 F.3d 208 (2d Cir. 2001) ................................................................................. 19

*Ludlow v. Nw. Univ.,*
79 F. Supp. 3d 824 (N.D. Ill. 2015) .................................................................... 20

*Luevano v. Wal-Mart Stores, Inc.,*
722 F.3d 1014 (7th Cir. 2013) .............................................................................. 15

*Martin v. F.E. Moran, Inc. Fire Prot.,*
2018 U.S. Dist. LEXIS 54179 (N.D. Ill. Mar. 30, 2018) ..................................... 9

*Mattenson v. Baxter Healthcare Corp.,*
438 F.3d 763 (7th Cir. 2006) ................................................................................. 9

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) .............................................................................................. 8

*Mlynczak v. Bodman,*
442 F.3d 1050 (7th Cir. 2006) .............................................................................. 19

*Morgan v. SVT, LLC,*
724 F.3d 990 (7th Cir. 2013) ................................................................................ 22

*Oest v. Ill. Dep't of Corr.,*
240 F.3d 605 (7th Cir. 2001) ............................................................................... 15

*Ortiz v. Werner Enterprises, Inc.,*
 834 F.3d 760 (7th Cir. 2016) ................................................................. 8

*Preston v. Eli Lilly & Co.,*
 2021 U.S. Dist. LEXIS 227482 (S.D. Ind. Oct. 5, 2021) ......................... 14

*Ruedlinger v. Jarrett,*
 106 F.3d 212, 214 (7th Cir. 1997 ........................................................... 20

*Sarsha v. Sears, Roebuck & Co.,*
 3 F.3d 1035, 1038 (7th Cir. 1993) ........................................................... 7

*Schmidt v. Hands on CDL Driving Sch.,*
 2022 U.S. Dist. LEXIS 38388 (W.D. Wis. Mar. 4, 2022) ......................... 14

*Smith v. Bray,*
 681 F.3d 888 (7th Cir. 2012) ................................................................. 23

*Stephens v. Erickson,*
 569 F.3d 779 (7th Cir. 2009) ................................................................. 22

*Stewart v. Ill., DOT,*
 2019 U.S. Dist. LEXIS 80671 (N.D. Ill. May 14, 2019) ........................... 9

*Stone v. City of Indianapolis Pub. Utils. Div.,*
 281 F.3d 640 (7th Cir. 2002) ................................................................. 13

*United States EEOC v. Custom Cos.,*
 2006 U.S. Dist. LEXIS 94846 (N.D. Ill. Oct. 23, 2006) ..................... 18, 22

*Vickers v. Abbott Lab.,*
 308 Ill. App. 3d 393 (1999) ................................................................... 20

*Volling v. Kurtz Paramedic Servs.,*
 840 F.3d 378 (7th Cir. 2016) ................................................................... 1

*Weaver v. Casa Gallardo, Inc.,*
 922 F.2d 1515 (11th Cir. 1991) ............................................................. 26

**STATUTES**

28 USC §1927 ................................................................................................................. 28

740 Ill. Comp. Stat. Ann. 174/20 ................................................................................. 26

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................. 7

Plaintiff brings this action under Title VII and the Illinois Human Rights Act[1] to challenge Defendant's unlawful gender discrimination and retaliation against her (Counts I-IV), and under Illinois statutory and common law to challenge Defendant's retaliation against her for opposing and refusing to participate in other unlawful conduct (Counts V and VI). Defendant seeks summary judgment on all counts, and in doing so, presents a highly misleading version of the facts and ignores and misrepresents evidence. Defendant's motion should be denied.

## I.     Statement of Facts

Plaintiff was hired by Defendant in 2013 and was promoted twice within two years, with the second promotion being in 2016 to Area Sales Manager ("ASM"), where her primary function was selling the $2 million da Vinci Surgical System. ASF 1, RSF 9. From 2014 through 2016, Plaintiff met or exceeded her sales quotas and in 2016, Plaintiff's first year as an ASM, she achieved 115% of her quota and ranked 13th out of 27 ASMs nationally. ASF 1. 2017 was a rebuilding year given the long sales cycle for the da Vinci system and Plaintiff's tremendous success in closing so many sales in 2016. SOF 9, RSF 34. Plaintiff missed her quota in 2017, but Defendant knew it would take time to rebuild her pipeline and her manager at the time, Area Sales Director ("ASD") Andy Stoner ("Stoner"), did not issue Plaintiff a performance improvement plan ("PIP") because it was not necessary. ASF 3, RSF 16.

In January 2018, Defendant shifted Plaintiff's territory and she began reporting to Victor Ebong ("Ebong"), a newly promoted ASD whose promotion had been supported by one of his previous managers, Clinical Vice President Adam Clark ("Clark"). ASF 5, RSF 45.  Clark supported Ebong being promoted to ASD even though two women who previously reported to

---

[1] Illinois courts apply the federal Title VII framework to IHRA claims, *Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378, 383 (7th Cir. 2016).

Ebong had complained to Clark that Ebong was physically intimidating, aggressive, belittling, demeaning, and had threatened their jobs. RSF 45, 48. Clark discounted the women's complaints and supported Ebong's promotion to the position where he became Plaintiff's supervisor and subjected her to strikingly similar discriminatory treatment. RSF 45, 48, 49.

With the territory and manager shift, Plaintiff began reporting to a new Area Vice President ("AVP"), Lucas Docter ("Docter"), who was Ebong's supervisor. SOF 23. Plaintiff's work situation changed dramatically for the worse under her new managers, whose first act was taking several of Plaintiff's accounts away from her and giving them to a man to boost his performance and earnings at her expense. RSF 28. Plaintiff believed this to be discriminatory as she had witnessed Defendant unjustly take accounts away from other women and she told Ebong she felt she was being discriminated against because of her gender. RSF 33, ASF 6-9.

Plaintiff's discrimination complaint to Ebong was on January 5, 2018, and just two days later, on January 7, 2018, Ebong initiated the idea of putting Plaintiff on a PIP. RSF 33, 37. Defendant contends the taking away of her accounts and the PIP that was ultimately imposed on Plaintiff in March 2018 were done because Plaintiff was ranked last among all ASMs, because she missed her quota in one year (2017), and based on the strongly disputed claim that she had performance issues in 2017. RSF 21, 22, 24, 26, 27, 29, 62. Men with genuine performance issues, however, were not similarly penalized:

- **Chris Andrews - 2016.** As of the third quarter of 2016, male ASM Chris Andrews, who was on Docter's team, ranked last among all ASMs nationally. Andrews ended 2016 ranked 26 out of 27 and had only attained 60% of his quota, as compared to Plaintiff, who had attained 115% of her quota. Despite Andrews' low ranking and failure to meet his quota, Andrews was not given a PIP or any performance management for his performance in 2016. ASF 30.

- **Chris Andrews – 2018.** In 2018, Andrews had performance issues with pipeline management, alignment with customers, respect of his clinical team (who complained he was not working hard), and ability to take direction on communication to senior leadership. Andrews also lied and damaged trust with a doctor to the point the doctor no longer wanted

2

to work with Defendant because of Andrews' misconduct. Docter and Ebong still did not issue Andrews a PIP or Final Written Warning ("FWW") or fire him.  RSF 63.

- **Chris Andrews – Verbal Written Warning.** Defendant falsely presents to the Court that Andrews received a PIP; he did not.  Ebong and Docter issued Andrews a "Verbal Warning Letter" on October 9, 2018, then after *50 days* extended the Verbal Warning by an *additional 30 days*, even though he had not met every metric. He was never issued a PIP or fired.  RSF 63.  For Plaintiff, Docter and Ebong never extended Plaintiff's PIP even though she made progress and had sold 4 systems in Q4 2018. RSF 76.

- **Kris Benson.** Defendant claims Plaintiff was the lowest ranked ASM by far in 2017, but the difference between Plaintiff's overall weighted ranking and male ASM Benson's overall weighted ranking was 0.2.  Benson also ranked last in certain categories: in "Attainment," Plaintiff ranked 36 and Benson ranked 37 (last); in "Strategic Accounts," Plaintiff ranked 32 and Benson ranked 37 (last). Benson's quota attainment for 2017 was only 39.5%, as compared to Plaintiff's 49.8%. Despite comparable rankings, Benson suffered no adverse actions. RSF 37.

- **Mike Hodgkiss.** Male ASM Mike Hodgkiss failed to meet his quota for two consecutive years: in 2016 he only attained 69% of his quota and in 2017 he attained only 67% of his quota. Nonetheless, Hodgkiss was not given a PIP until April 2018. Plaintiff was given a PIP the first and only time she did not meet her quota. ASF 31, RSF 62.

- **Brian Brant.** Male ASM Brian Brant, who was on Docter's team, had performance issues, but instead of receiving a PIP, he was allowed to continue working through the end of the quarter, with pay and without ever being placed on a PIP, and to voluntarily resign. RSF 63.

- **10 male ASMs** under Docter had performance issues, but none were issued a FWW like Plaintiff. ASF 33

- **10 male ASMs** under Docter had performance issues, but not a single one was fired. ASF 34.

At a sales meeting the week after her initial complaint to Ebong, Plaintiff again reported the discriminatory account realignment. RSF 45.  She subsequently made other complaints to management and to HR about Ebong's discriminatory and frightening behavior and other unlawful conduct by him in January, February, March and April 2018 (detailed in RSF 45). Plaintiff had hoped her complaints would cause Defendant to take meaningful remedial action but it did not. Instead, Defendant's HR representatives Henry Pastor ("Pastor") and Sarah Sirko

("Sirko") conducted a seriously flawed and biased "investigation" and refused to remove Ebong as Plaintiff's manager despite two other women (Jennifer Lehmann and Gina Steinhoff) corroborating her concerns about him (e.g. false field ride reports, verbal harassment, public humiliation, physical intimidation). RSF 40, 45, 46, 48, 49. As just one example of Defendant's deficient "investigation," when Sirko questioned Lehmann and Steinhoff, who Plaintiff had identified as potential witnesses to Ebong talking about the size of his penis, Sirko failed to ask either woman about the comment, claiming this glaring omission was "a miss." RSF 45. Pastor's involvement was equally flawed in that he questioned and chose to rely upon the views of Clark, Ebong's prior manager, who minimized the women's complaints and told Pastor that their only concern was Ebong's "style." RSF 48. Clark did not tell Pastor that Lehmann had reported to him that after a field ride she had feared Ebong would become violent, and even though Lehmann herself told human resources about this incident, HR still chose to credit Clark to conclude there was no hostile work environment created by Ebong. RSF 48. HR relied on Clark in reaching this result despite knowing that in November of 2017, just three months earlier, they had investigated Clark over *his* discriminatory behavior, namely drunkenly assaulting a female subordinate at a hotel during a management meeting. ASF 10-12; RSF 45, 48.

After dismissing Plaintiff's complaints, Defendant allowed Ebong and Docter to begin a campaign of harassment, discrimination and retaliation against Plaintiff which culminated in it firing her on January 4, 2019. RSF 45, 83, ASF 26-29, 35-41. To be sure, Ebong retaliated against Plaintiff because of her complaints about him by unjustly criticizing her performance, issuing her a sham PIP and FWW, intensely and disparately monitoring her performance, excluding her from meetings and communications, and firing her. ASF 37-41, RSF 39, 40, 62, 66, 74, 83, 86. There is direct evidence that Ebong took these actions because he was incensed

by Plaintiff's complaints, including: his testimony that Plaintiff's discrimination complaints were "completely ridiculous" and that she should have been disciplined for making an ethics report about him; multiple emails in which Ebong accuses Plaintiff of making baseless allegations, calls her dishonest, and asks Defendant to "take immediate actions" to stop her; and his threat to personally sue *her* over her complaints. ASF 42-46, RSF 58.

Defendant otherwise subjected Plaintiff to a hostile work environment in which Plaintiff, the only woman on Ebong's team and one of only a few female ASMs in the entire company, was subjected to sexist and sexually inappropriate comments. ASF 5, 26-29. Plaintiff's experiences were not unique to her; Defendant fostered a deeply entrenched culture where women were mistreated and devalued and men who engaged in the unlawful discrimination were protected at great lengths. ASF 5-25.

Plaintiff took a medical leave of absence from May to November 2018 because of the severe stress and anxiety caused by Defendant. RSF 68. When she returned to work, she was required to continue reporting to Ebong and was held to the same metrics he had issued to her in the sham March 2018 PIP, even though Ebong and Docter allowed her to contact only 10 accounts – which Ebong selected – instead of all 81 of her accounts. RSF 69, 72. Plaintiff's complaints about this and other discrimination following her leave were met with name calling and hostility by management and HR, just as they were before her leave. RSF 69, ASF 37-38.

During Plaintiff's final 60 days of employment, Defendant scrutinized everything she did to justify firing her, including pulling email, mileage and credit card reports on Plaintiff and comparing her activity from the previous year, when she had 70 to 80 accounts, to her activity in November and December 2018, when she had just returned from a medical leave of absence and was only allowed to contact 10 accounts. ASF 39-41, RSF 69, 73, 74, 75, 76, 77, 79, 80.

Defendant also ignored Plaintiff's commendable job performance in that she had moved up to the rank of 29 out of 36 (up from 37 out of 37 in 2017) and had sold four systems in the fourth quarter of 2018. RSF 83. Ultimately, Defendant fired Plaintiff on January 4, 2019 claiming she had not met the requirements of the PIP and FWW. RSF 83. By comparison, men who had genuine performance issues were not subjected to the same scrutiny as Plaintiff and during the same time period, Defendant did not fire a single male ASM. ASF 30-34, RSF 83.

Defendant attempts to insulate Ebong from the decision to fire Plaintiff by claiming it removed him from Plaintiff's reporting structure right before she was fired and that the decision to fire her was made solely by Docter. SOF 72, 85. This claim is false. Ebong remained heavily involved in Plaintiff's employment up through the date of her termination and Defendant has acknowledged that one of Ebong's reports about her (even though unjust) was the final straw in its decision to fire her. RSF 72, 85. As further evidence of Ebong's hand in the termination decision, on December 20, 2018, Ebong sent an email to Defendant's General Counsel accusing Plaintiff of making baseless allegations against him. RSF 58. In his message, Ebong asked the General Counsel to "take immediate actions" to stop Plaintiff, and Defendant did what Ebong asked and fired her two weeks later. RSF 58.

Further, even if Docter made the termination decision alone, Docter was complicit in Ebong's discrimination and retaliation against Plaintiff and overtly discriminated and retaliated against her up through the date she was fired. Docter imposed upon Plaintiff standards and expectations that were not required of men (e.g. 5 Pillars) and demonstrated his animosity about Plaintiff's raising concerns about gender discrimination by interrupting her with a scoff, rolling his eyes at the mere mention of her concerns, and storming out of a meeting. RSF 10, 60, 63, 64, 74, 75, 77, 83. Docter's discriminatory and retaliatory animus is also plainly evidenced by his

decision to rate Plaintiff as "underperforming" in December 2018 when she had just sold 4 da Vinci systems in the fourth quarter of 2018 and while she ranked 29 out of 36 ASMs. By comparison, Docter gave male and non-complaining ASMs who ranked lower than Plaintiff, higher ratings. ASF 33-34. Docter and Pastor then fired Plaintiff on January 4, 2019. RSF 83.

Defendant further claims that HR played no role in the decision to fire Plaintiff, but this claim is also false; Pastor and Sirko were involved. RSF 84. Notably, the same HR team who botched the investigation into Plaintiff's claims (RSF 45) and were involved in firing her had previously investigated Clark for assaulting a female subordinate at a work event. Clark was not fired and went on to sexually assault another woman before he was allowed to resign with dignity and a substantial severance payment. ASF 11-23. Defendant's decision to continue to employ Clark after he sexually harassed a female subordinate and merely issue him a FWW, which he then went on to violate several times and *still* was not fired, when it fired a high performing female employee because she complained, is emblematic of Defendant's culture of protecting men who abuse and mistreat women and punishing women who oppose it. ASF 10-25.

## II.    Legal Standard

"Summary judgment is only appropriate when 'there is no genuine issue as to any material fact and…the moving party is entitled to a judgment as a matter of law.'" *Culver v. Gorman & Co.,* 416 F.3d 540, 545 (7th Cir. 2005)(citing Fed. R. Civ. P. 56). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." *Culver,* at 545 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986)). Especially in employment discrimination and retaliation cases, "where intent and credibility are crucial issues," courts must apply the summary judgment standards "with added rigor." *Stewart v. Ill., DOT*, 2019 U.S. Dist. LEXIS 80671, at *13 (N.D. Ill. May 14, 2019)(citing *Sarsha v. Sears,*

*Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993)).

**III.    Plaintiff's Gender Discrimination Claim Should Be Decided By A Jury**

Defendant argues it is entitled to summary judgment on Plaintiff's gender claims for four reasons: (1) it contends Plaintiff cannot satisfy the elements of the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting analysis; (2) it misstates the adverse actions Plaintiff suffered; (3) as part of its superfluous analysis of *McDonnell Douglas*, Defendant claims Plaintiff did not meet its legitimate expectations, that no similarly situated men exist, and that Plaintiff cannot establish pretext; and (4) it misrepresents Plaintiff's hostile work environment allegations. Defendant's arguments are unavailing.

**A.    Plaintiff Does Not Rely On *McDonnell Douglas* Burden-Shifting Framework**

Defendant argues Plaintiff cannot satisfy the *McDonnell* burden-shifting test, but case law is clear that she is not required to do so to survive summary judgment. *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760, 766 (7th Cir. 2016)(while *McDonnell Douglas* remains a valid method of proving a Title VII claim, it is a <u>nonexclusive</u> method of proof.) In *Ortiz,* the Seventh Circuit refined the approach required in evaluating Title VII claims. Eschewing the "rat's nest of surplus tests", the court refocused the inquiry on "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's … sex …or other proscribed factor caused the discharge or other adverse employment action." *Brown v. Chi. Transit Auth.*, 2020 U.S. Dist. LEXIS 27222, at *17-18 (N.D. Ill. Feb. 14, 2020)(quoting *Ortiz*, 834 F.3d at 765). The case must be assessed for an "overall likelihood of discrimination." *Joll v. Valparaiso Cmty. Sch.,* 953 F.3d 923, 933(7th Cir. 2020) (citing *Ortiz* at 763, 765). Here, a wealth of evidence would permit a reasonable jury to conclude that Defendant discriminated against Plaintiff because of her gender.

**B.    A Jury Could Readily Conclude Defendant Engaged In Sex Discrimination**

To make a case of sex discrimination without resorting to *McDonnell Douglas*, Plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination. *Joll,* 953 F.3d at 929. This can include circumstantial evidence of a discriminatory work environment or other forms of evidence like comments, differential treatment and dishonest explanations by the defendant.  All forms of evidence exist here.

## 1.    Defendant's Culture Of Discriminating And Retaliating Against Women

Evidence of the existence of a discriminatory atmosphere at a defendant's workplace may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 770 (7th Cir. 2006)("[p]roof of a pervasive firm or divisional culture of prejudice against ... female [] workers" "implies some likelihood that the plaintiff lost [her] job because of discrimination); *Martin v. F.E. Moran, Inc. Fire Prot*., 2018 U.S. Dist. LEXIS 54179, at *93 (N.D. Ill. Mar. 30, 2018)(evidence of discriminatory culture tends to add color to employer's decision-making processes and influences behind the actions taken toward individual plaintiff). Further, "[e]vidence of a … discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with … [the] timeframe involved in the specific events that generated a claim of discriminatory treatment." *Anaya v. Birck,* 2022 U.S. Dist. LEXIS 87066, at *18-19 (N.D. Ill. May 13, 2022)(citing cases).

Here, Defendant's behavior toward Plaintiff was part of the company's larger pattern of discriminating against women, including denying women equal chances to succeed (such as Stephanie H. who, like Plaintiff, had her territory taken away from her and given to a man) ASF 7-8, systemically minimizing and outright ignoring women's reports of harassment and discrimination (like Amanda C., who reported Clark's sexual harassment multiple times to no avail) ASF 15-18, allowing egregious sexual assaults against women (like Marietta D., who

reported that Clark sexually assaulted her) ASF 13, condoning jokes essentially about raping female employees, ASF 24-25, and retaliating against women, like Plaintiff, Amanda C., and Marietta D., who challenge the discrimination. ASF 14, 22. This is not an environment that values women and that attitude naturally affects how female employees are treated.

### 2. Defendant's Culture Of Protecting Men Who Mistreat Women

Defendant also has a culture of protecting men who are known to harass women. For example, Clark, a Vice President accused of sexual harassment by multiple women, was allowed to continue working in a position of power after drunkenly assaulting a female subordinate. ASF 11-12. Defendant turned a blind eye to Clark's conduct, allowed him to repeatedly violate the so-called final warning he had been placed on, and empowered him to harass other women until he was ultimately allowed to resign with dignity and a substantial severance. ASF 13-23. For further example, just as it did with Clark, Defendant went to great length to protect and defend Ebong, willfully ignoring the fact that three women had complained of his harassment and intimidation of them and choosing to rely on a known sexual harasser, Clark, to discredit the women's complaints. Plaintiff was forced to continue reporting to Ebong for months, giving him the opportunity to further mistreat her, including threatening to personally sue her over her discrimination complaints, up through the day she was fired. In the Seventh Circuit, Plaintiff may use this type of evidence to demonstrate pretext to support her individual claim. *Bell v. E.P.A.,* 232 F.3d 546, 553 (7th Cir. 2000) ("[E]vidence of systemic disparate treatment is relevant to and probative of the issue of pretext."); *Henderson v. Shulkin*, 720 F. App'x 776, 785 (7th Cir. 2017)(district court wrongly dismissed "evidence regarding other employees and other matters not connected to" Title VII plaintiff because "a jury could infer discriminatory intent from that evidence").

### 3. Defendant's Comments, Conduct, And Differential Treatment

Plaintiff also relies on the three broad types of circumstantial evidence the Seventh Circuit has recognized as supporting an inference of intentional discrimination: (1) ambiguous/suggestive comments/conduct and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; and (3) dishonest employer justifications for disparate treatment. *Joll*, 953 F.3d at 929.

Consistent with Defendant's biased culture, Defendant employs very few women in the position of ASM and goes to great lengths to protect men with performance deficiencies from any adverse consequences, as compared to how it treats women like Plaintiff, who was harassed, retaliated against and fired. RSF 39, 40, 45, 62, 66, 74, 83, 86. Defendant's discriminatory treatment affected virtually every aspect of Plaintiff's employment beginning with its discriminatory removal of her accounts and reassignment of them to a man orchestrated by Ebong. RSF 28. Defendant also disciplined Plaintiff the first and only year she missed her sales quota whereas men who missed their quotas and/or who ranked at the bottom of all ASMs like Chris Andrews and Mike Hodgkiss, were not similarly disciplined or penalized. RSF 63-64, ASF 30-34. Defendant also did not apply its formal progressive discipline policy equally to Plaintiff and her male counterparts and even lies about having such a policy. ASF 30, 31; RSF 5, 63. Plaintiff was otherwise held to other performance standards like the 5 pillars while men were not. RSF 10. Perhaps most telling is Defendant has not fired a single male ASM for poor performance despite the fact that there are plainly men with genuine performance issues. ASF 30-34, RSF 63. Defendant even allowed Plaintiff's male manager to threaten to sue her personally, fired her within days of her complaint about this threat, and then threatened its own

11

(frivolous) legal action against her. ASF 1, RSF 79, 83, 87, 88. In addition to being retaliatory, Defendant's threat to sue Plaintiff for conversion is further evidence of differential treatment as it knew that Ebong had similarly emailed himself documents, yet it chose not to threaten or discipline him over the same alleged violation. RSF 88.

Defendant also treated Plaintiff differently when Ebong baselessly accused her of discrimination. When Plaintiff made complaints about Ebong, Defendant claimed to conduct a full (albeit seriously flawed), investigation to exonerate him and denied Plaintiff's request not to continue reporting to him. RSF 45. By comparison, when Ebong lodged baseless accusations against Plaintiff and said he no longer wanted to work with her, Defendant immediately, albeit superficially, changed the reporting structure, chose not to conduct an investigation to exonerate her, and then despite knowing there was no evidence whatsoever to support Ebong's claims, harassed Plaintiff at her deposition and accused her of "trying to railroad a black man." RSF 58.

### 4. Dishonest Justifications For Disparate Treatment / Pretext

Because Plaintiff is not proceeding under *McDonnell Douglas* she is not required to establish that she was meeting Defendant's legitimate expectations or that Defendant's proffered justifications are pretext, but she readily can. These two issues overlap given Defendant's claim that it fired Plaintiff for poor performance and Plaintiff's claim that she was meeting all expectations and the performance explanation is pretext. In fact, Plaintiff relies on Defendant's dishonest justifications as additional circumstantial evidence of gender discrimination.

Defendant claims it fired Plaintiff for failing to meet objectively measured expectations, but its entire argument is based on disputed facts. Defendant claims it put Plaintiff on a PIP because she ranked last out of all ASMs and that Ebong's and Docter's counterparts who managed her in 2017 indicated they had wanted to place her on a PIP. This is false, see RSF 22,

12

and significantly, similarly situated male ASMs who ranked last at various times were not put on PIPs or fired. ASF 30, 31; RSF 27, 31, 63. To be sure, male ASM Benson's ranking in 2017 was comparable to Plaintiff's, but his ranking was excused as an anomaly. RSF 27.

Defendant's claim that Plaintiff failed to meet various metrics under the PIP is also disputed. In support of its claim, Defendant relies on a self-serving email from Ebong – who by the time of the PIP had an admitted motive to retaliate against Plaintiff because he believed she had made claims about him and should be disciplined for doing so – reporting **his** view of Plaintiff's activities but Defendant cites no other evidence that Plaintiff was failing to meet metrics. ASF 42-43, RSF 65. Indeed, Plaintiff disputes she was not performing under the PIP and cites her own evidence that she was meeting deadlines and doing everything she could to fulfill the PIP, including selling four da Vinci systems the quarter before she was fired. RSF 65, 79. Further, Defendant acknowledged Plaintiff had made progress on the PIP but still chose to issue her a FWW exactly 30 days thereafter, in contrast to a male ASM who Defendant chose to give more time to before issuing him a FWW because he was making progress. RSF 66.

As further evidence of pretext, Defendant did not fire a single man for performance, though it is undisputed that male ASMs had performance deficiencies. ASF 30-34. Most significantly, the primary function of an ASM is to sell the da Vinci robot and in the fourth quarter of 2018, Plaintiff sold four and had improved her ranking to 29 out of all 36 ASMs yet Defendant still fired her. RSF 83. A jury may ultimately believe Defendant's explanation that Plaintiff's termination was based on performance, but "[t]he fact that the defendant may be able to produce evidence that the plaintiff was fired for a lawful reason just creates an issue of fact: what was the true cause of the discharge?" *Dunn v. Hamra Enters.,* 2022 U.S. Dist. LEXIS 168121, at *19-20 (N.D. Ill. Sep. 16, 2022)(quoting *Stone v. City of Indianapolis Pub. Utils.*

13

*Div.*, 281 F.3d 640, 643 (7th Cir. 2002); *Schmidt v. Hands on CDL Driving Sch.*, 2022 U.S. Dist. LEXIS 38388, at *16 (W.D. Wis. Mar. 4, 2022)(summary judgment denied despite defendant providing a "potential, even powerful, lawful reason" for termination). Just as in *Dunn*, it will be up to a jury to decide which story holds water. 2022 U.S. Dist. LEXIS 168121, at *20.

## C.     Defendant Subjected Plaintiff To Adverse Actions Beyond Her Termination

Defendant argues it is entitled to summary judgment with respect to certain adverse actions. Defendant concedes, as it must, that Plaintiff's termination is an adverse employment action, but claims the "realignment" of Plaintiff's territory is not an adverse action because it was a "lateral transfer" that did not affect her pay. (Def. Memo p. 4) This argument is frivolous. Actions that deprive an employee of compensation which she otherwise would have earned constitute adverse employment actions for the purposes of Title VII. *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008). Defendant's taking multiple accounts from Plaintiff and giving them to a man caused Plaintiff to lose more than half a million dollars in commissions in a single year, unquestionably an adverse action under applicable law. RSF 32.

Defendant also argues that Plaintiff's PIP and FWW are not adverse employment actions. While Plaintiff recognizes case law holding that unfair reprimands or negative performance evaluations, **unaccompanied by some tangible job consequence**, do not constitute adverse employment actions, *Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016), in this case the PIP and FWW were accompanied by a tangible job consequence: Plaintiff's termination. As such, they were adverse actions. *See Preston v. Eli Lilly & Co.*, 2021 U.S. Dist. LEXIS 227482, at *6-7, 9 (S.D. Ind. Oct. 5, 2021)(denying motion to dismiss on grounds that a PIP was not an adverse employment action where plaintiff alleged PIP led to her termination); *Leghari v. Wilkie,* 2022 U.S. Dist. LEXIS 153950, at *14 (N.D. Ind. Aug. 25, 2022)(where jury could conclude that PIP

14

imposed new conditions on plaintiff's employment, PIP may constitute an adverse action).[2]

**D.     Plaintiff's Hostile Work Environment Claim Should Be Decided By A Jury**

In addition to disparate treatment, Plaintiff can establish gender discrimination by demonstrating that Defendant's sexual harassment created a hostile working environment. In the Seventh Circuit, sexual harassment is "not limited to acts of sexual desire, but rather is a broad term which encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." *Hildebrandt v. Ill. Dep't of Nat. Res.,* 347 F.3d 1014, 1033 (7th Cir. 2003). "A plaintiff can prove a hostile environment claim without proving that the serious hostile behavior is sexual in content as long as it was motivated by the plaintiff's sex. Thus, 'a plaintiff can proceed on a claim when the work environment is hostile because it is sexist rather than sexual.'" *Luevano v. Wal-Mart Stores, Inc*., 722 F.3d 1014, 1028 fn. 8 (7th Cir. 2013)(citation omitted).

Defendant asserts that the only evidence Plaintiff relies on to support this claim is the realignment of her accounts, her PIP, and Ebong's yelling, aggressiveness, negative feedback, and general criticism. This is inaccurate. Plaintiff relies on a litany of discriminatory, offensive and hostile conduct to support her harassment claims, including overtly sexual comments. ASF 26-29. Plaintiff was also: verbally harassed, stripped of her accounts, physically intimidated, forced into a car by her manager, berated in public, interrogated by her supervisors, excluded from meetings and communications, subjected to untruthful performance critiques, held to unreasonable performance expectations not placed on men, called crass, sarcastic and snarky for

---

[2] Even if the PIP and FWW cannot, standing alone, state a claim of discrimination, "they can constitute relevant evidence of discrimination with respect to other employment actions that clearly are adverse employment actions under the statute." *Oest v. Ill. Dep't of Corr.,* 240 F.3d 605, 613 (7th Cir. 2001); *Bagwe v. Sedgwick Claims Mgmt. Servs.,* 811 F.3d 866, 889 (7th Cir. 2016)(noting a PIP could constitute relevant evidence of retaliation).

reporting gender discrimination, accused of not being a team player, put on a PIP the very first time she ever missed quota when men never were, put on a FWW and threatened with termination when men with performance deficiencies were not and despite selling four da Vinci systems, restricted in the accounts she was allowed to contact upon return from medical leave, scoffed at by Docter for raising gender issues, subjected to monitoring and scrutiny not imposed on men, threatened with legal action by her manager because she complained of gender discrimination, fired, and threatened by Defendant with more legal action. RSF 39, 40, 59, 61, 62, 64, 66, 70, 74, 75, 77, 83, 86, 88. These actions collectively demonstrate that Plaintiff was subjected to unwelcome and severe or pervasive conduct that negatively impacted her work environment and are more than sufficient to survive summary judgment. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 696 (7th Cir. 2001)(reversing summary judgment on a hostile work environment claim because the sum total of plaintiff's allegations – consisting of a decree that men not help women, discriminatory comments, increased workload, failure to assist plaintiff, and attempts to hinder her performance of job duties – could lead a reasonable fact finder to find a "general hostility to the presence of women in the workplace").

Defendant also argues that Ebong's treatment of Plaintiff was not based on sex because men also complained about him and because Ebong also put men on PIPs. Defendant's former argument is unfounded because the men who allegedly complained about Ebong each had favorable things to say about him and none reported physical intimidation like Plaintiff and other women did. RSF 46, 49, 56. Defendant's latter argument is an outright lie. Ebong *never* placed a male employee on a PIP and the male ASM who was issued a warning was given more time than Plaintiff to improve and was not fired. RSF 63, 66.

Defendant next claims "unambiguous documentation" concerning the realignment of

16

Plaintiff's territory "establishes conclusively" that the operations department pushed the change based on her ranking, ignoring the fact that Docter and Ebong, not the operations department, made the decision to take accounts from Plaintiff and give them to a man, with Ebong advocating on behalf of the male ASM to get "more dirt." RSF 28. Further, Defendant has a pattern of taking accounts away from women and giving them to men, and a jury could infer from all the evidence that the realignment was based on gender. ASF 7-8.

Lastly, Defendant mentions Plaintiff's PIP as not being sufficiently severe or pervasive to constitute a hostile work environment, but as detailed above, Plaintiff's hostile environment claim is based on the totality of the sexist, demeaning and threatening treatment she endured. *EEOC v. Costco Wholesale Corp*., 903 F.3d 618, 626 (7th Cir. 2018)(actionable discrimination can take other forms, such as demeaning, ostracizing, or even terrorizing the victim because of her sex). Here, there is sufficient evidence for a reasonable juror to find that Defendant's conduct was objectively severe or pervasive.

## IV. Plaintiff's Retaliation Claim Survives Summary Judgment

To prevail on her retaliation claims, Plaintiff must prove that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Brown*, 2020 U.S. Dist. LEXIS 27222, at *28 (citing *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)).

Defendant does not dispute that Plaintiff engaged in protected activity or that she was fired, but argues  it is entitled to summary judgment because: (1) Ebong's and its own threats to personally sue Plaintiff are not adverse actions; (2) there is no causal connection between Plaintiff's complaints and her termination; and (3) Plaintiff was not meeting its expectations, offered no comparator evidence, and cannot establish pretext. Each of these arguments fails.

### A.    Asserting Baseless Legal Claims Is An Adverse Action

It is undisputed that Ebong, a Director-level employee, threatened to personally sue Plaintiff, his subordinate and current employee of Defendant, over her internal discrimination, retaliation and ethics complaints. RSF 86. It is also undisputed that Defendant knew about Ebong's threat as of December 27, 2018, yet it chose to do nothing about it; instead, Defendant fired Plaintiff eight days after she complained that Ebong's threat was an additional act of retaliation. RSF 88. This conduct violates the anti-retaliation provision of Title VII as expressed by the U.S. Supreme Court in *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)(anti-retaliation provision covers employer actions that would have been materially adverse to a reasonable employee, meaning that the employer's actions are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination). Indeed, courts within the Seventh Circuit have held that filing a lawsuit, not in good faith and instead motivated by retaliation, can be a basis for a retaliation claim under Title VII. *See, e.g., United States EEOC v. Custom Cos.*, 2006 U.S. Dist. LEXIS 94846, at *49 (N.D. Ill. Oct. 23, 2006)(holding plaintiff suffered an adverse action by being sued by defendant and forced to incur the expense of hiring attorneys); *Ishkhanian v. Forrester Clinic S.C.,* 2003 U.S. Dist. LEXIS 11041, at *6-8 (N.D. Ill. June 25, 2003)(denying motion to dismiss retaliation claim alleging plaintiff's former employer retaliated against her by filing a civil action and noting that the economic impact of being sued civilly could have a significant chilling effect on filing or continuing to pursue charges with the EEOC.

Further, courts have recognized that the mere threat of a lawsuit often provokes individuals to change their actions and if a reasonable worker believes she might face a lawsuit if she files a complaint alleging discrimination, she might be dissuaded from filing such a

18

complaint. *Bentivegna v. People's United Bank*, 2017 U.S. Dist. LEXIS 156445, at *10 (E.D.N.Y. Sep. 25, 2017). Ebong's threat to sue Plaintiff is similar to a letter analyzed in *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.* 263 F.3d 208, 213-214, 223 (2d Cir. 2001). In that case, the defendant's president responded to an employee's protected activity by calling the employee's allegations "slanderous" and threatening that "[i]f she continue[d] this behavior, [defendant would] have no choice but to address [her] behavior through legal channels." The court in that case reversed summary judgment, holding that a jury could find that the president's letter was retaliation. *Lovejoy*, 263 F.3d at 223.

Defendant's citation to *Mlynczak v. Bodman*, 442 F.3d 1050, 1061 (7th Cir. 2006) for the proposition that a manager's personal threat of a lawsuit is not an adverse action absent a showing that it was "independently an abuse of process" does not change the outcome here. A jury could easily conclude that Ebong's decision to threaten frivolous legal claims and Defendant's willful refusal to take any action to address his retaliatory conduct was an abuse of process. The legal claims Ebong asserted against Plaintiff are untenable for two reasons. First, aside from the fact that he has absolutely no factual basis for such claims (RSF 58), Ebong does not have a cognizable claim against Plaintiff for race or national origin discrimination as there is no individual liability under Title VII. *Geier v. Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996). As for Section 1981, while an individual can be liable in some cases, such liability arises only in suits against supervisors or those who have exercised managerial authority over the plaintiff. Defendant has not cited, and Plaintiff has not found, any decision in which a court has allowed a §1981 claim to proceed against a subordinate employee who was neither a supervisor nor exercised supervisory authority. Second, Ebong has no viable claim against Plaintiff for defamation based on statements she made to Defendant in the context of reporting and opposing

19

gender discrimination, retaliation and ethical violations, where her statements were true and at a minimum, subject to qualified privilege. *See Ludlow v. Nw. Univ.,* 79 F. Supp. 3d 824, 845 (N.D. Ill. 2015)(employee statement made to an employer's investigator about alleged employee misconduct subject to qualified privilege). "If no privilege existed, then victims of harassment and companies with a goal to preventing harassment would be 'handcuffed' by a fear of defamation liability." *Vickers v. Abbott Lab*., 308 Ill. App. 3d 393, 402 (1999). *See also, EEOC v. Virginia Carolina Veneer Corp.*, 495 F.Supp. 775, 778 (W.D. Va. 1980)(defamation lawsuit following an EEOC charge "unquestionably retaliatory").

Defendant readily condoned Ebong's effort to intimidate Plaintiff, and then subsequently piled on after firing her by falsely accusing Plaintiff of misappropriating trade secrets and conversion, despite knowing Ebong had done the same thing it accused Plaintiff of doing and suffered no consequences. RSF 88. Further, Defendant did not benignly send a single letter to Plaintiff's counsel "regarding her obligations to return Defendant's documents" as it now claims. Instead, within days of firing her, Defendant demanded that Plaintiff, at her own expense, hire a forensics firm to perform a "seek and destroy" of allegedly confidential material, that she sign a declaration admitting to violating an employment agreement, and demanded she preserve data or be subjected to "severe sanctions" and attorneys' fees. RSF 88. Defendant's legal threats against Plaintiff are adverse actions for the same reasons Ebong's are under applicable law cited above.[3]

**B.    Plaintiff Was Subjected To Other Adverse Actions Beyond Her Termination**

The adverse actions Defendant took against Plaintiff also include the sham PIP/FWW

---

[3] Defendant's reliance on *Ruedlinger v. Jarrett*, 106 F.3d 212, 214 (7th Cir. 1997 is misplaced in light of the Supreme Court's subsequent decision in *Burlington,* holding that Title VII's antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. 548 U.S. at 57.

issued by Ebong and Docter, intense monitoring and heightened scrutiny by Ebong and Docter, Ebong's harassment and physical intimidation, Defendant's deliberately inadequate investigation into her complaints, Ebong's and Docter's false field ride reports, Ebong excluding Plaintiff from communications and Docter condoning it, and Ebong's decision to limit her to just 10 accounts when she returned from medical leave. All of these actions would dissuade a reasonable worker from making or supporting a charge of discrimination, which is all that is required in the retaliation context. *See Curtis v. City of Chi.*, 2019 U.S. Dist. LEXIS 135228, at *38-39 (N.D. Ill. Aug. 12, 2019)(PIP could qualify as an adverse action in retaliation context where it lead to further disciplinary measures); *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833 (7th Cir. 2015) (allegations of screaming, false disciplinary reports, exclusion from social functions, and denial of time off "would certainly cause a reasonable worker to think twice about complaining about discrimination."); *Flanagan v. Office of the Chief Judge*, 2007 U.S. Dist. LEXIS 75208, at *26-27 (N.D. Ill. Sep. 28, 2007)(heightened scrutiny could reasonably constitute a materially adverse employment action that might dissuade an employee from making or supporting a charge of discrimination).

### C. Direct Evidence Of Retaliatory Motive And Causal Link

The standard for demonstrating causation for a Title VII retaliation claim is whether, considering the evidence as a whole, the defendant took an adverse employment action because the plaintiff engaged in a protected activity. *Brown,* 2020 U.S. Dist. LEXIS 27222, at *32. The Seventh Circuit explained the standard for surviving summary judgment in *Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015):

> To demonstrate a "causal link" between the protected activity and the adverse employment action, a plaintiff must show the defendant "would not have taken the adverse ... action but for [her] protected activity." *King v. Preferred Technical Grp*., 166 F.3d 887, 892 (7th Cir. 1999). Direct evidence typically requires an admission

by the employer of discriminatory animus, which is "rare." *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008). But a plaintiff may also supply the causal link through circumstantial evidence from which a jury may infer intentional discrimination. *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009). Such circumstantial evidence may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). When the plaintiff has "assemble[d] from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013).

## 1. Direct Evidence Of Defendant's Retaliatory Motive

Plaintiff presents the "rare" case in which there is direct evidence of Defendant's retaliatory motive. A jury will not have to guess whether Ebong was angered by Plaintiff's discrimination complaints or whether he wanted to take action against her because of her complaints because he openly testified about his animosity toward Plaintiff and put his views in writing. Direct evidence of Defendant's retaliatory animus includes: (1) Ebong's testimony that Plaintiff's complaints in February 2018 were "completely ridiculous." RSF 58; (2) Ebong's testimony that Plaintiff's ethics report about him was made in bad faith and that she should have been disciplined for making it. ASF 43; (3) Ebong's February 15, 2018 email to HR, days after Plaintiff's ethics and discrimination complaints, calling her "dishonest" and expressing his desire to manage her performance and behaviors moving forward. ASF 44; (4) Ebong's November 8, 2018 email in which he called Plaintiff's concerns baseless and accused her of trying to "sully [his] reputation," and refused to continue working with her. RSF 71; (5) Ebong's December 20, 2018 email to Defendant's General Counsel in which he made similar claims about Plaintiff and asked Defendant to "take immediate actions" to stop her. RSF 58; and (6) Ebong's threat to personally sue Plaintiff based on her complaints. ASF 45-46. Ebong's own words are direct evidence of retaliatory motive. *Custom Cos.*, 2006 U.S. Dist. LEXIS 94846, at *45 (president's

threats over plaintiff's EEOC charge were direct evidence of a retaliatory motive).

Defendant attempts to neutralize this damaging evidence by falsely claiming that Docter alone made the decision to fire Plaintiff; this claim is baseless for three reasons. First, Ebong's involvement in disciplining Plaintiff up to and including her termination is well-documented. See RSF 72, 85. Second, even if Docter did not himself have retaliatory animus (he did), Defendant is still liable under the cat's paw theory, which can be imposed on an employer where the plaintiff can show that an employee with discriminatory animus like Ebong provided factual information or other input that may have affected the adverse employment action. *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012). Under this theory, "if a supervisor performs an act motivated by a discriminatory or retaliatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Hicks v. Forest Preserve Dist*., 677 F.3d 781, 790 (7th Cir. 2012). Here, Defendant claims it fired Plaintiff for not meeting the metrics of the PIP/FWW – disciplinary actions first suggested by Ebong two days after Plaintiff first complained of his gender discrimination – and which Ebong implemented and monitored until he allegedly "removed himself" from "the Merrilee business." Defendant cannot distance Ebong from the ultimate decision when he set the standards for, monitored and reported on Plaintiff's performance under the PIP/FWW up to the day she was fired, in addition to him severely restricting the accounts she could contact when she returned from leave and explicitly asking Defendant's General Counsel to take action against Plaintiff just two weeks before she was fired. Indeed, Defendant admitted that one of Ebong's reports about Plaintiff was the "final straw" in firing her. At a minimum Ebong's involvement in Plaintiff's termination is a question of fact for a jury. Third, Ebong undisputedly was involved in the other adverse actions at issue as detailed in sections IV(A) and

23

(B) above. Based on this direct evidence alone, Defendant's motion should be denied.

**2. Circumstantial Evidence**

Plaintiff also relies on circumstantial evidence to establish a causal link between her complaints and Defendant's adverse actions. First, there is suspicious timing. Ebong proposed disciplining Plaintiff two days after she complained of gender discrimination, then conducted a 3-day field ride during which he excluded her from a client meeting, publicly humiliated her under the guise of giving feedback, emailed her a false account of her performance, and issued her a PIP within weeks of her making formal discrimination and harassment complaints -- complaints Ebong called "ridiculous." The PIP was followed by intense monitoring and scrutiny and a FWW, all of which caused Plaintiff so much stress and anxiety she was required to take a 5-month medical leave of absence. Immediately upon her return from leave, Plaintiff was reissued the PIP, followed closely by the FWW and again intensely monitored and unfairly scrutinized by both Ebong and Docter. Further, Ebong stripped Plaintiff of all but 10 of her accounts (that he chose), while at the same time holding her to the same metrics imposed upon her under the PIP/FWW when she had 70 to 80 accounts. Plaintiff complained of Defendant's discriminatory treatment in November, December and January, but her concerns were minimized and ignored. RSF 45. Then on December 27, 2018, Plaintiff complained to Defendant that Ebong had threatened to sue her over her discrimination complaints and eight days later, without investigating or addressing Ebong's retaliatory threat, Defendant fired her. ASF 47-49.

Defendant disingenuously argues that Plaintiff cannot establish causation because 11 months elapsed between her initial complaint and her termination, ignoring Plaintiff's 5-month medical leave and the fact that Defendant's relentless discrimination and retaliation commenced immediately upon her return. Defendant immediately re-issued the PIP, a FWW, then fired her

with lock-step precision after each 30 day-mark, as compared to a man whose performance management was repeatedly extended. RSF 63. Defendant also argues that Plaintiff's November 12, 2018 and January 4, 2019 emails are not sufficiently close in time to her termination because by the time she sent those emails, she had already been issued a PIP and FWW. This argument ignores the retaliatory nature of the PIP and FWW, which were designed from the beginning of 2018 to create a pretextual justification for firing Plaintiff in retaliation for her complaints.

Second, Plaintiff relies on evidence that other employees were treated differently and that Defendant's proffered reasons for the adverse actions against her are pretextual, as detailed in sections III(B)(3) and (4) above. More specifically, Defendant did not fire a single male ASM with performance issues, or even advance any of the 10 male ASMs it purportedly disciplined for poor performance to a FWW like it did Plaintiff. For male ASMs like Andrews, Defendant also granted him leeway in meeting his metrics, yet for Plaintiff, both Ebong and Docter created a "record" of Plaintiff's alleged performance deficiencies. RSF 36, 60. Docter created an 11-page document called "development notes" about Plaintiff, which he claims he did when working directly with an individual on their development, yet Docter also worked with Ebong on his development but did not take a single note about any of his interactions with Ebong. RSF 60.

Defendant's excessive and disparate monitoring of Plaintiff as compared to male employees is further evidence establishing a causal link between Plaintiff's complaints and Defendant's adverse actions. *Bob-Maunuel v. Chipotle Mexican Grill, Inc.*, 10 F. Supp. 3d 854, 886 (N.D. Ill. 2014)(evidence that managers, who were aware of plaintiff's EEOC Charge, increased their monitoring of plaintiff's performance and increased the frequency in which they documented his alleged deficiencies sufficient to establish a causal link between plaintiff's complaints and his termination); *Flanagan,* 2007 U.S. Dist. LEXIS 75208 at *43-44 (quoting

25

*Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1525 (11th Cir. 1991))("the pronounced increase in negative reviews and the careful scrutiny of plaintiff's performance, coupled with testimony suggesting that management personnel were acutely aware of plaintiff's EEOC charge, is sufficient to establish a causal link") *Collins v. Village of Woodbridge,* 96 F. Supp. 2d. 744 (N.D. Ill. 2000)("a pattern of criticism by supervisors following the making of complaint can establish the existence of causal link."). Finally, Defendant's claim that it fired Plaintiff over her performance is pretext, as detailed in section III(B)(4) above.

## V.     Defendant Fired Plaintiff In Violation Of Illinois Law

### A.  Plaintiff's Common Law Retaliatory Discharge Claim

To state a claim for retaliatory discharge under Illinois law, "an employee must allege that (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) the discharge violates a clear mandate of public policy. *Dunn,* 2022 U.S. Dist. LEXIS 168121, at *20. Defendant does not dispute that Plaintiff was fired or that her discharge violated a clear mandate of public policy (which it obviously did as Plaintiff reported conduct she believed violated the federal Anti-Kickback Act, among other federal and state laws) and instead only challenges Plaintiff's ability to establish causation, again claiming the 11-month time period between Plaintiff's ethics complaint and her termination is insufficient. This argument fails given the direct evidence of Defendant's retaliatory animus: Ebong testified that Plaintiff should have been disciplined for making the ethics complaint, and he continued to express this belief in his December 20, 2018 email to Defendant's General Counsel in which he asked her to "take immediate actions" to stop Plaintiff, which is exactly what Defendant did when it fired her two weeks later. A reasonable jury could readily conclude from this evidence and Defendant's pretextual explanation that Plaintiff was fired in retaliation for making the ethics complaint.

### B.  Plaintiff's Statutory Claim Under The Illinois Whistleblower Act

Under the Illinois Whistleblower Act, "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. Ann. 174/20. Defendant does not dispute that the activity at issue, an alleged bribe to a surgeon, would result in a violation of the law, but instead rehashes its arguments about causation, which Plaintiff already refuted above, and claims that Plaintiff did not refuse to participate in the unlawful activity. This is disputed. Plaintiff refused to participate in Ebong's scheme to bribe the surgeon by taking steps to ensure he could not go through with it. Those steps included involving an independent service called ComplianceLine to stop the scheme, making Docter aware of Ebong's conduct and telling Docter that she had filed a formal report with the compliance hotline, conferring with the CSR who was also present when Ebong suggested a quid pro quo, and participating in the investigation into Ebong's conduct. RSF 41. A reasonable jury could conclude from this evidence that Plaintiff refused to participate in unlawful activity. *See Beers v. E.R. Wagner Mfg. Co.*, 2013 U.S. Dist. LEXIS 54376, at *11 (N.D. Ill. Apr. 17, 2013)(denying motion to dismiss IWA claim where plaintiff's emails regarding scheme to deceive customers by providing inferior product and profiting from that deception sufficiently alleged he refused to participate in activity that would result in a violation of the law). Accordingly, Defendant's motion should be denied.

## VI.  Defendant And Its Lawyers Should Be Sanctioned

Defendant knew before filing its motion for summary judgment about all the evidence supporting Plaintiff's claims, including its entrenched culture of discriminating against women and protecting men who assault, harass and discriminate against women. It also knew that its claims about Plaintiff's alleged performance issues were disputed and that men who truly had

performance issues were never disciplined like she was, let alone fired. In the face of this evidence, Defendant chose to file a motion in which it makes dishonest statements such as "it is undisputed that [Defendant] does not have a progressive discipline policy" (Def. Memo. p. 16) when its Director of Human Resources testified, "There is a formal progressive discipline policy that we've implemented within the sales organization, RSF 5, and "there is no evidence that similarly situated male employees existed, let alone were treated more favorably" (Def. Memo p. 7) when Chis Andrews meets the definition of a similarly situated employee who was treated more favorably by any standard. ASF 30, RSF 63, 64.

Defendant's counsel repeatedly represented to this Court that it had a good faith basis for seeking summary judgment, but the overwhelming disputed facts belie this claim. The fact that the Federal Rules of Civil Procedure allow for defendants to seek summary judgment does not mean it is appropriate in every case. The Court should send a message to Defendant and others like it that there are consequences for pursuing vexatious litigation tactics and award Plaintiff her attorneys' fees pursuant to 28 USC §1927[4] for having to respond to this frivolous motion.

## VII.    Conclusion

For all the foregoing reasons, Defendant's motion for summary judgment should be denied in its entirety and Plaintiff should be awarded attorneys' fees under 28 USC §1927.

Dated: October 13, 2022                                 Respectfully submitted,

                                                        */s/ Jill Weinstein*
                                                        Pedersen & Weinstein LLP

---

[4] Under 28 USC § 1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2022, a copy of the foregoing *Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* was filed electronically. Notice of this filing will be sent to the following by operation of the Court's electronic case filing system. Parties may access this filing through the Court's system.

Darren E. Nadel
Kelsey A. VanOverloop
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202-5835
DNadel@littler.com
kvanoverloop@littler.com

David Loren Christlieb
Kerri Lynn Feczko
Littler Mendelson, P.C.
321 North Clark Street, Suite 1000
Chicago, IL 60654
dchristlieb@littler.com
kfeczko@littler.com

/s/Jill Weinstein
Jill Weinstein

Erika Pedersen
Jill Weinstein
**PEDERSEN & WEINSTEIN LLP**
33 N. Dearborn Street, Suite 1170
Chicago, IL 60602
(312) 322-0710
(312) 322-0717 (facsimile)