**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MERRILEE DIRICKSON,

Plaintiff,

v.

INTUITIVE SURGICAL, INC.,

Defendant.

Case No. 19-CV-7149

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Merrilee Dirickson worked in sales for Defendant Intuitive Surgical, Inc. until Defendant terminated her. Defendant maintains it did so because of Plaintiff's poor work performance. Plaintiff sees it differently, claiming that Defendant subjected her to a hostile work environment, discriminated against her because of her sex, and retaliated against her. Plaintiff brings a variety of federal and state-law claims to seek redress for her alleged injuries. Defendant moves for summary judgment on all claims. [130]. For the reasons explained below, this Court grants in part and denies in part Defendant's motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

1

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND

As a preliminary matter, Defendant raises evidentiary objections regarding Plaintiff's response to Defendant's statement of facts and statement of additional facts. This Court maintains broad discretion to enforce the local rules governing summary judgment motions, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371,

2

382 n.2 (7th Cir. 2008), and addresses Defendant's evidentiary objections before turning to the facts of the case.

Defendant contends that many of Plaintiff's responses to Defendant's statement of facts contain additional "facts" rather than dispute the cited fact. *Id.* This Court has reviewed some of these responses and agrees that Plaintiff often improperly introduces new additional facts in her responses to Plaintiff's facts. *See De v. City of Chicago*, 912 F. Supp. 2d 709, 715 (N.D. Ill. 2012) (noting that the "the nonmoving party's additional facts belong in a *separate* statement"). One such example, among many, is contained in Plaintiff's response to Defendant's fact 45. *See* [151] ¶ 45. Defendant's fact 45 contains a simple assertion that Plaintiff complained about gender discrimination in two emails on February 20, 2018 and on March 1, 2018. *Id.* Instead of simply admitting or disputing these facts, Plaintiff responds to this fact with seventeen pages of additional factual assertions presenting her account of events. *See id.* This is frustrating to the Court, as it appears Plaintiff has "intended to complicate rather than simplify the court's task." *Portis v. City of Chicago*, 510 F. Supp. 2d 461, 463–64 (N.D. Ill. 2007). Regardless, given the length of the parties' submissions, this Court will not strike these responses wholesale, and will instead evaluate them on a fact-by-fact basis, to the extent pertinent to the analysis.

Defendant argues that fifty-five of Plaintiff's responses to Defendant's statement of facts do not cite to record evidence and impermissibly cross-reference other facts. [170] at 10. Again, this Court sees no need to dive into these responses at

3

the outset and will assess these facts on a case-by-case basis, to the extent material to its analysis.

Defendant moves to strike the declaration of Plaintiff's former colleague, Amanda C., because it lacks foundation, includes hearsay, and states legal conclusions. [170] at 12. This Court has reviewed Amanda C.'s declaration [153-42] and agrees that it contains several statements that are not admissible. For instance, Amanda C. speculates that Defendant permitted one supervisor to remain employed at the company despite being fully aware that he was a serial sexual harasser. *Id.* ¶ 6. Speculation is, of course, not evidence. *Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1039 (7th Cir. 2016). Amanda C. also offers impermissible hearsay, stating that she heard from someone else that the supervisor had sex with a subordinate in a hotel room. *Id.* ¶ 7; Fed. R. Evid. 801. This Court disregards these inadmissible statements. Amanda C.'s declaration, however, does contain many other statements that are not based on hearsay or speculation and do not state legal conclusions. For example, she attests to her own experience of being sexually harassed by a supervisor, and of another experience with coming forward to complain about sexual harassment. [153-42] ¶¶ 6–7. These are facts based on her personal knowledge and are not otherwise inadmissible. Thus, this Court will not strike the entirety of Amanda C.'s declaration.

With these evidentiary issues resolved, this Court turns to the background facts, which it takes from Defendant's statement of facts (DSOF) [132], Plaintiff's response to Defendant's statement of facts (PRSOF) [151] and statement of additional

facts (PSAF) [152], and Defendant's response to Plaintiff's statement of additional facts (DRSAF) [172].

## I. The Parties

Defendant operates a robotics company that sells the DaVinci Robot; the Robot assists surgeons in performing minimally invasive surgery. DSOF ¶ 1. Defendant employed Plaintiff from April 2013 to January 2019, most recently as an Area Sales Manager (ASM) in Chicago. *Id.* ¶ 2.

Defendant initially hired Plaintiff in 2013 as a Clinical Sales Representative (CSR) and promoted her twice within two years—first to Senior CSR in 2014, and to ASM in 2016. PSAF ¶ 1. In 2014, Plaintiff attained 103% of her sales quota; in 2015, she reached 100% of her sales quota. *Id.* In 2016, she attained 115% of her sales quota and ranked 13th out of 27 ASMs nationally. *Id.* As a CSR and senior CSR, Plaintiff grew the company's general surgery business in her territory over 600%. *Id.* ¶ 2.

## II. ASM Responsibilities

When Defendant made Plaintiff an ASM in 2016, she moved from Defendant's "clinical" to "capital" side of its business. DSOF ¶ 7. While they collaborate with each other, the "clinical" sales force primarily builds relationships with individual doctors and promotes the use of existing Robots for surgeries, while the "capital" sales force typically sells new or upgraded Robots to hospitals. *Id.* ¶ 8. Defendant's "capital" sales strategy applicable to ASMs includes the fundamental "5 Pillars" sales approach: (1) clinical selling; (2) QTI (quantify the impact); (3) MDE (market development event)

strategy; (4) impending events; and (5) executive discovery and validations. *Id.* ¶ 10. The first pillar—clinical selling—requires ASMs to identify, target, and engage with surgeons with the goal of developing them into advocates of Defendant's robotic products. *Id.* ¶ 11. The second, QTI, entails observing and meeting with surgeons who use Defendant's products, analyzing their surgical data to quantify the value of the Robot, and presenting each surgeon with individualized, quantitative analysis demonstrating the medical and economic impact of Defendant's Robots. *Id.* ¶ 12. Pillars three and four—MDE strategy and impending events—require ASMs to assist surgeons in planning and presenting the data gathered during the second pillar at educational events. *Id.* ¶ 13. And the final pillar, executive discovery and validations, requires ASMs to present to hospital executives. *Id.* ¶ 14.

### III. Plaintiff's Performance As An ASM

In 2016, Plaintiff's first year as an ASM, she ranked 14th out of 29 ASMs and exceeded her quota. *Id.* ¶ 15.

According to Defendant, in 2017, Plaintiff's then-manager, Andy Stoner, determined that Plaintiff was having difficulty utilizing the "capital" sales force's fundamental sales strategy which impacted her performance. *Id.* ¶ 16. In October 2017, Stoner wrote himself an email, documenting a conversation he claims to have had with Plaintiff. [133-19]; DSOF ¶ 19. In it, he wrote: "Since she is not happy in the ASM role, we discussed her moving forward in the ASM role or moving to a CSR role. . . . I told her that [she] has high support to continue [working] with [Defendant] but that there were some concerns with her ability to do the ASM job. At that time she

6

asked me if I could get Chip to waive her non-compete clause." [133-19] at 2. Plaintiff disputes that she said the things Stoner wrote, particularly with respect to her unhappiness in the ASM role. PRSOF ¶ 19. According to Plaintiff, when she spoke with Stoner in October 2017, she was asking him to support her with the all-male clinical team and that the male clinical sales managers refused to align, partner, and collaborate with her. *Id.*

By the end of 2017, hospital administrators began to indicate that Plaintiff should not be included in future conversations about sales. DSOF ¶ 21. Toward the end of 2017, a chair of a hospital's surgical division said that Plaintiff was harming the ability to move forward and was "too pushy." [133-16] at 40. Another, a vice president of surgical services, asked that Plaintiff "take a backseat" on any capital conversations. *Id.* at 41. According to Defendant, by December 2017, Plaintiff was "way behind" her target sales, finishing 46% to quota. DSOF ¶ 22. Plaintiff does not dispute the 46% figure, but insists that 2017 was a "rebuilding year" after a successful year in 2016. PRSOF ¶ 22.

At the end of 2017, as a result of organizational changes, the management of the Chicago market transitioned from Area Vice President of the Eastern U.S., Chip Bowman, to Area Vice President of the Western U.S., Lucas Docter. DSOF ¶ 23. Docter testified that he spoke with Bowman about Plaintiff as part of the transition. [133-2] at 19–20. Bowman told Docter that Stoner had been working with Plaintiff on her development; that the company allowed her to pursue employment with a competitor, but she did not get the job; and that afterward, Bowman and Stoner

planned "to put [Plaintiff] on a performance improvement plan." *Id.* at 21. Bowman also told Docter that Plaintiff "was not performing the fundamentals or the key activities of the role." *Id.* at 25. In addition, Docter received reports from Lindsay Otradovec (the Chicago area Clinical Sales Director at the time) that Plaintiff was canceling meetings with doctors, was difficult to reach, and was generally unprepared. [133-12] ¶ 22. Docter also heard from Otradovec that two hospital executives in Plaintiff's territory had told Otradovec that they no longer wanted to work with Plaintiff. *Id.* ¶ 23.

As part of the company's realignment, Docter promoted Victor Ebong to Area Sales Director in the Western Region; as a result, Ebong took over management responsibilities for Stoner. DSOF ¶ 25. Until that time, Ebong worked in Denver and had no responsibility for the Chicago market. *Id.* Upon the transition, Stoner relayed to Ebong that Plaintiff "was having struggles in the ASM jobs," that she "wasn't sure if she wanted to do the ASM job anymore," and that "she was actually interviewing with another robotics company." [133-9] at 11–13. Stoner told Ebong that "I felt like there was going to be some performance management that was going to be taking place if her and I were still aligned." *Id.* at 13.

Defendant ranked Plaintiff 37th out of 37 ASMs in 2017. DSOF ¶ 27; [133-2] at 4. Defendant based this ranking on several factors including quota attainment, expanding Defendant's reach, total number of Robots sold, and number of strategic accounts. DSOF ¶ 27. Subsequently, Brett Kirouac (a male individual), manager of sales operations and analytics, recommended moving sales for Northern Chicago from

Plaintiff to a male ASM, Mark N., who had sold 200% to quota in 2017. *Id.* ¶¶ 28, 29. Docter ultimately agreed with Kirouac's recommendation. *Id.* ¶ 29. As Ebong testified, although Docter made the ultimate decision, the decision was reached after input from a group of people including Kirouac, Lindsey Otravodec (the clinical sales director), and Ebong himself. [133-15] at 25–26. Although the realignment did not affect Plaintiff's base or the target commission she could earn, DSOF ¶ 32, Plaintiff's actual compensation suffered by more than half a million dollars, PRSOF ¶ 32.

In Ebong's first in-person meeting with Plaintiff on January 5, 2018, Ebong explained that Defendant was realigning some of Plaintiff's accounts to Mark N. DSOF ¶ 33. As Ebong recalls, upon hearing the news, Plaintiff "started saying stuff like I've seen the organization try and do this before, you know, to female employee or push them out." [133-15] at 33. On January 7, 2018, Ebong advised Docter that he thought the company should place Plaintiff on a performance plan. DSOF ¶ 37.

A fundamental aspect of Defendant's management of its sales force involves "field rides," where managers accompany and observe their direct reports on the road by attending meetings during a several days' trip and providing feedback. *Id.* ¶ 38. Plaintiff testified that during Ebong's field ride with her in January 2018, he "intimidated me, he berated me, he discriminated against me" in delivering feedback to her. [133-1] at 55, 59, 140; DSOF ¶ 40.

## IV. Plaintiff's Continued Performance and Complaints in 2018

On February 5, 2018, Plaintiff called ComplianceLine, a complaint hotline that Defendant uses, and alleged that Ebong had engaged in unethical conduct during a

meeting four days prior by bribing a doctor with grant money in return for the doctor agreeing to audit a training course. DSOF ¶ 41; PRSOF ¶ 41. Following receipt of this hotline complaint, Nancy Hill, Defendant's Vice President of Employee Relations, asked Henry Pastor, the Director of Human Resources, and his report, Sarah Sirko, to conduct an investigation into Plaintiff's complaint. DSOF ¶ 42. Pastor and/or Sirko interviewed Plaintiff, Kamilah Brewton (Plaintiff's team member who was present during the meeting in which Ebong allegedly bribed a doctor), Ebong, and the doctor in question. *Id.* ¶ 43. Pastor and Sirko also reviewed documentation. *Id.* They concluded that Ebong had not committed a compliance violation and had not engaged in any wrongdoing. *Id.*

On or around February 20, 2018, and in a follow up email on March 1, 2018, Plaintiff complained to Pastor and Sirko that Ebong had engaged in gender discrimination when he verbally harassed her in a public restaurant, interrogated her, and mischaracterized her performance, and that Defendant discriminated against her when it realigned her territory and gave some of her accounts to Mark N. *Id.* ¶ 45. Plaintiff also complained that Ebong had discriminated against two female employees he previously managed, Gina Steinhoff and Jennifer Lehmann. *Id.*

Docter took over Plaintiff's management at the end of February 2018. *Id.* ¶ 47. Plaintiff asserts, however, that in retaliation for her complaints against Ebong, Docter issued Plaintiff a performance improvement plan (PIP) under Ebong's supervision and required Plaintiff to continue reporting to Ebong. PRSOF ¶ 47.

Pastor and Sirko initiated an investigation into Plaintiff's February and March 2018 complaints and interviewed several current and former employees—Plaintiff, Lehmann, Steinhoff, Adam Clark, Jarrod Bowers, Docter, Ebong, Otradovec, Stoner, and Kirouac. DSOF ¶ 48. Lehmann and Steinhoff corroborated that Ebong had been verbally aggressive with them and felt that he had unfairly managed them. *Id.* ¶ 49. As Lehmann testified in her deposition, during a work trip Ebong leaned into her and aggressively spoke to her. [153-15] at 13. Lehmann testified she was afraid for her physical safety. *Id.* at 14. Steinhoff testified that Ebong talked about the size of his genitalia at a work outing. [153-16] at 37–38. She also testified about an altercation at a meeting where Ebong was "using his voice to belittle and turn it into my performance, my unwillingness to do certain things, and ultimately that I just wanted to leave the company and go get married." [153-16] at 10. Steinhoff testified that she believed Ebong was disparaging her because he knew she was planning to move to a small town with her fiancé. *Id.* at 13. After the investigation, Pastor and Sirko concluded that Ebong was overly direct and confrontational in his management of Plaintiff, but that his conduct was not based on her gender. DSOF ¶ 52. Plaintiff disputes that Pastor and Sirko conducted a good faith investigation. PRSOF ¶ 52.

In or around February or March 2018, Docter met with Ebong and coached him on issues he had with his interactions with team members. DSOF ¶ 54.

In early March 2018, Docter conducted a field ride with Plaintiff, during which he concluded she needed to improve her application of the 5 Pillars sales strategy. [133-12] ¶ 24. According to Docter's declaration, she underperformed during this field

11

ride. Specifically, Plaintiff did not reach out to a local team in another state with which they were coordinating; the slide decks she presented did not have commitment dates for the surgeons and hospitals, as required under Pillar 4; and the slide deck had information about the wrong Robot. *Id.* Docter also assessed that Plaintiff failed to effectively utilize and implement the first three of the 5 Pillars, such that when she would try to get to Pillar 5 (validations from a hospital's C-suite), she would suffer from not having done the legwork. *Id.* ¶ 25. On March 8, 2019, Docter emailed Plaintiff about a specific meeting with executives and explained that Plaintiff's slide deck missed key information about a Robot and omitted dates of upcoming planned market events, and instructed it was important to have this information in a meeting with hospital executives and surgeons. *Id.* ¶ 26.

Docter issued Plaintiff a PIP on March 27, 2018 that instructed Plaintiff to focus her efforts on the 5 Pillars. *Id.* ¶ 27. Docter issued Plaintiff a Final Written Warning (FWW) on April 27, 2018. DSOF ¶ 66. Docter says he did so because Plaintiff did not make sufficient progress on the specific actions outline in her PIP after thirty days. [133-12] ¶ 34.

### V. Plaintiff's Medical Leave and Return

From May 2018 to November 2018, Plaintiff took a medical leave of absence. DSOF ¶ 68. Plaintiff says she required the leave because of "severe stress and anxiety caused by Defendant." PSAF ¶ 39. Upon her return, Docter kept Plaintiff's PIP and FWW in place; however, Docter did not require her to complete the FWW within thirty days of her return and instead gave her thirty days to reacclimate herself with

12

the territory and an additional thirty days to meet her PIP requirements. [133-12] ¶ 37.

Shortly after her return from leave, on November 8, 2018, Plaintiff sent an email to Pastor, Docter, and Ebong stating that she did not want to have any contact with Ebong and that she was "physically afraid" of Ebong. DSOF ¶ 70. Ebong emailed a response to Docter and Pastor stating, among other things, that he had "never physically threatened" Plaintiff, that he did not think it was a good idea for him to communicate with Plaintiff "in any way, shape, form or fashion," and that he could not continue to have a working relationship with her. *Id.* Defendant maintains that as a result, Docter decided (after consulting with Pastor), that Ebong would no longer have contact with Plaintiff and that Docter would be responsible for all of Plaintiff's management as of November 9, 2018. *Id.* ¶ 72. Plaintiff did, however, remain on Ebong's team, and thus, Docter continued to communicate with Ebong, including about how she progressed in her PIP. [133-2] at 90.

On November 12, 2018, Plaintiff emailed Pastor, Docter, and Sirko, restating her belief that her PIP was discriminatory and that she was pursuing her claims "through the legal process." DSOF ¶ 73. Less than a month later, on December 5, 2018, Docter informed Plaintiff she was given a final thirty days to comply with her FWW and detailed the areas where she had not made progress against the 5 Pillars. *Id.* ¶ 74. Docter further noted other mandatory metrics that Plaintiff failed to meet in the previous four weeks, including: (1) only providing two updates to her Chessboard pipeline management tool in weekly reports when Defendant expected

13

her to provide four; (2) failing to provide any pre-call planning sheets when Defendant expected to provide three completed pre-call planning sheets each day; (3) only sending one weekly recap on her performance to plan (which was twenty-one days later) when Defendant expected her to send four recaps on a weekly basis; (4) failing to update her MDE plan; and (5) failing to track her "Milestone Activities," which led Docter to believe that Plaintiff had completed only two of the weekly activities, when he expected her to perform fourteen per week. *Id.* ¶ 75. In November and December 2018, Docter received reports from members of his Chicago team, including Otradovec, stating that Plaintiff was missing calls, canceling appointments, failing to respond to emails, failing to visit hospitals, and failing to show up to scheduled dinner meetings with customers and colleagues. [133-12] ¶ 41.

Plaintiff sent Docter and Pastor an email on December 14, 2018. [133-69]. In it, she stated that "the re-acclimation process was extensive and the expectation that I complete the weekly activities my first week back is unrealistic." *Id.* at 2. She also said: "Notwithstanding your unfair criticism, I believe I am currently ranked #31 out of 36 ASMs and . . . I have forecasted five deals that will close in December." She continued that "I am surprised and disappointed that you continue to threaten to fire me" and "have no doubt that this would not be happening to me if I were a man or had not reported my concerns of unlawful treatment." *Id.* at 3.

According to Docter, he became concerned that Plaintiff was not even trying to make progress and accordingly directed a review of her email volume, mileage, and credit card usage for the months of November and December 2018 and compared

them to the same data from 2017. [133-12] ¶ 42. The review revealed that Plaintiff's work activity "was very low" in December 2018; she also had not logged any mileage for November or December 2018, and her email activity fell off significantly. *Id.* ¶ 43.

On December 27, 2017, Outset Medical, Inc. offered Plaintiff a job, and she accepted the position on December 31, 2018, while still employed with Defendant. DSOF ¶ 81. Plaintiff did not advise anyone at the company that she accepted another position. *Id.* ¶ 82. According to Defendant, she missed a sales meeting with hospital executives on January 3, 2019 and booked a vacation to St. Lucia for January 7–12, 2019, which coincided with Defendant's national sales meeting where in-person attendance was mandatory. *Id.* Plaintiff, for her part, disputes that she "missed" the sales meeting, as she texted her colleague Andrew Geers that she would be missing. PRSOF ¶ 82.

## VI. Plaintiff's Termination

Docter terminated Plaintiff's employment on January 3, 2019. DSOF ¶ 83. He asserts that he made this decision because of Plaintiff's "failures to make material progress on the objectively measurable expectations in her PIP, FWW, and her overall lack of sales activity." [133-12] ¶ 45. Although he consulted with Pastor and internal legal counsel, Docter made the final decision to terminate Plaintiff. *Id.* ¶ 46. Docter did not confer with Ebong about his decision to terminate Plaintiff. *Id.* ¶ 47.

In December 2018, Ebong complained of discrimination against Plaintiff via email. DSOF ¶ 58. When Pastor spoke to Ebong about his complaint in January 2019,

15

Ebong said he understood Dirickson had been terminated, and that because she had left the company, he did not see a reason to pursue his complaint. *Id.*

## VII. Plaintiff's Additional Evidence Relating to Hostile Work Environment

Plaintiff claims Defendant subjected her and other female colleagues to a hostile work environment. As to herself, Plaintiff claims that Ebong bragged to her that his wife was a supermodel from Europe whom he had met when he was a basketball player. PSAF ¶ 29.[1]

Plaintiff also points to evidence of other female employees' experiences.[2] As one example, a male supervisor, Adam Clark, approached a female subordinate, put his arm around her waist, and tried to kiss her several times at a work event in 2017. PSAF ¶ 10; DRSAF ¶ 10. Pastor and Sirko investigated the subordinate's assault complaint against Clark; Pastor then issued Clark a final written warning. PSAF ¶ 11.

---

[1] Plaintiff also includes facts regarding an incident that occurred in January 2018 at a company meeting in Houston, Texas, but this Court disregards these facts as inadmissible. *See* PSAF ¶¶ 26–28. The facts rely upon the complaint's allegations which are insufficient on summary judgment. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020) (cautioning that the non-moving party must "go beyond the pleadings and support its contentions with proper documentary evidence.") (quotation omitted). Fact 26 also cites to some underlying deposition testimony, but this Court's review of the deposition testimony reveals that they do not support the asserted fact.

[2] Plaintiff recounts the experience of one of those employees, Stephanie H., by citing to Stephanie H.'s EEOC charge. *See* PSAF ¶¶ 6–9. Plaintiff also attempts to submit evidence regarding another female employee, Marietta D., citing to Marietta's EEOC charge. PSAF ¶¶ 13–14. Because statements in an EEOC charge constitute inadmissible hearsay, this Court disregards these facts. *See, e.g., Stolarczyk ex rel. Est. of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 843 nn. 6 & 11 (N.D. Ill. 2005) (noting that statements from an EEOC charge are not admissible).

Plaintiff submits the declaration of a female employee, Amanda C. [153-42]. In it, Amanda states that Matt Robinson sexually harassed her after a party held at Adam Clark's house in 2017. *Id.* ¶ 3. After the party, Amanda went back to a hotel bar for a drink with another employee; Robinson approached, appearing "extremely drunk," and commented that Amanda was "so sexy" and "so beautiful." *Id.* According to Amanda, Robinson repeatedly attempted to physically touch her and said multiple times "let's go up [to] my room." *Id.* Amanda states she made clear to him that his comments and physical touching were not welcome. *Id.* The bartender told Robinson to "back off." *Id.* Amanda did not report this incident. *Id.* ¶ 4.

Amanda claims Adam Clark was a serial "predator" and habitual drunk and harassed multiple women at the company. *Id.* ¶ 5. Amanda personally witnessed Clark stick his hand up the skirt and touch the thighs of Samantha, a clinical sales manager, one of his direct reports. *Id.* Moreover, Amanda attests, Clark was drunk at work meetings and functions "dozens of times." *Id.* ¶ 6. He would "lean into women too close, tell them how attractive they wer[e] and/or otherwise give them uninvited and unwanted sexual attention." *Id.* He did this to Amanda on one or two occasions. *Id.*

Amanda came forward on behalf of multiple women at the company to report Clark's sexual harassment toward the end of 2021. *Id.* ¶ 7. Amanda states that she found out that Clark was found to have violated the company's code of conduct and advised he would be fired, *id.*, but then on a Zoom call that she attended, Clark announced he was retiring for health reasons, *id.* ¶ 8. Amanda believes that

Defendant retaliated against her for reporting against Clark. *Id.* ¶ 11. Specifically, the company's vice president told her that she was being prepared for a promotion before she participated in the Clark sexual harassment investigation; after she participated, however, she was told she was no longer "in line for promotion." *Id.*

## VIII. Defendant's Discipline Policy and Treatment of Male Employees

Defendant asserts that the company has no formal progressive discipline policy. [133-12] ¶ 33. Pastor testified, however, that Defendant implemented a "formal progressive discipline policy" within its *sales force* that was in place in 2018. [153-1] at 13.

As of the third quarter of 2016, male ASM Chris Andrews ranked last among all ASMs nationally at the same time Plaintiff was ranked fourteenth. PSAF ¶ 30. Andrews ended 2016 ranked 26 out of 27 and had only attained 60% of his quota. *Id.* Defendant did not give Andrews a PIP or any performance management for his performance in 2016. *Id.* Defendant did give Andrews a "Verbal Warning Letter" in the fall of 2018. [133-12] ¶ 32 & pp. 16–18. As Ebong testified, a "Verbal Warning Letter" is "one step" before a PIP. [153-9] at 55. According to the "Verbal Warning Letter," Andrews' "performance, behaviors, and selling activities" were "sub optimal" and below expectations in 2018. [133-12] at 17. Andrews also had drafted a letter on behalf of the doctor and showed it to people without getting approval from the doctor, causing the doctor to ask to no longer work with the company. [153-9] at 56. Andrews resigned in March 2019. [133-5] at 20. In November 2018, Andrews verbally complained to the company that Ebong was a "bully" who "pushes so hard

that he makes people feel uncomfortable." DSOF ¶ 55. Andrews' complaints about Ebong were corroborated by several of Ebong's current and former male and female reports—who stated that Ebong was aggressive, confrontational, and condescending in his communications with them. *Id.* ¶ 56.

ASM Brian Brant received a written warning in 2015 or 2016 from his ASD, Tyler Boob, because "his alignment with his counterparts was poor." [133-12] at 12. Brant did not move past the written warning and voluntarily resigned. *Id.* at 13.

ASM Mike Hodgkiss failed to meet his quota attainment for two consecutive years—in 2016, he attained 60% of his quota, and in 2017, he attained 67% of his quota. PSAF ¶ 31. Hodgkiss was not given a PIP until April 2018. *Id.*

From 2015 to October 2020, ten male ASMs reporting to Docter directly or indirectly (through another manager), were issued written warnings or PIPs; none, however, were given a FWW like Plaintiff. *Id.* ¶ 33. According to Docter, prior to Plaintiff, every person he put on a PIP either improved in the ways the PIP required of them or they resigned. [133-12] ¶ 29.

**IX. Alleged Retaliation**

On February 26, 2018, Plaintiff raised her belief with Docter, Pastor, and Sirko that Ebong was purposely leaving her out of communications—specifically in his weekly reports—and stated in email to them that she had "personally secured more than 50% of the attendees at a VIP event at Defendant's corporate office, secured all travel and logistics for nearly all the participants, led a lab for all surgeons, participated in the VIP session, and led a recap call about the event" and further

stated in her email that she "worked with surgeons" to develop and craft the Cadaver Lab, "secured the lab space", "booked" a doctor to lead a course, and worked with various department chairs to ensure participation from all specialties. PSAF ¶ 37. Ebong, in his recap of the event, did not mention Plaintiff. *Id.* Pastor and Docter responded by claiming that Ebong was following their instructions to limit his communication with or about her while they investigated her complaints of discrimination. *Id.* ¶ 38.

On November 8, 2018, after Plaintiff returned to work from medical leave, Otradovec reported to Ebong that Plaintiff had adjusted some call times with CSMs because Ebong said that he had to join them with her; Otradovec asked Ebong if it was true that he asked Plaintiff to join the calls with CSMs. *Id.* ¶ 39. Ebong responded to Otradovec that it was not true: "Not true regarding need to adjust call times for me. Told her it was unlikely I would be able to join due to ASD all day meeting and my vacation Thursday and Friday. I asked her to CC me on follow up. I told her this in writing and verbally on the phone call yesterday morning. Thank you for keeping me in the loop." *Id.* The email from Ebong to Plaintiff did not, however, mention Ebong's vacation, and rather said "I will jump on as much as I can over the next day or so. I will be in an All Day ASD meeting beginning tomorrow." *Id.* ¶ 40. According to Plaintiff, Docter later chastised her when she submitted her activity report for the week, stating: "I did not join due to customer meetings, and [Ebong] was on vacation, both of which were communicated to you." *Id.* ¶ 41.

On February 15, 2018, ten days after Plaintiff reported Ebong's alleged ethics violation for bribing a doctor, Ebong sent Pastor an email with the subject "Merrillee Follow Up & Next Steps" in which he wrote he was "concerned with her performance and pattern of dishonesty as hindrances to our business and damaging our culture" and asked Pastor and human resources to "address[ ] this with [Plaintiff] during the debrief." *Id.* ¶ 44.

Plaintiff received a letter on December 24, 2018 from Ebong's lawyer titled "Cease and Desist – False Accusations." [155-32]. The letter demanded that Plaintiff stop making statements that were defamatory and harassing against Ebong. *Id.* at 2. On January 4, 2019, Plaintiff forwarded the letter to Pastor and Docter, stating she was "extremely concerned over how the company handles my concerns of discrimination and retaliation." *Id.* at 1. Ebong based his letter on information he had learned from human resources (Pastor and Sirko) while they investigated Plaintiff's discrimination and retaliation complaints. PSAF ¶ 46.

On December 27, 2018, Plaintiff, through her lawyer, wrote to Defendant's attorneys that Ebong's letter was "obvious retaliation" for Plaintiff's complaints of discrimination and retaliation. [153-23] at 1. Defendant's attorneys responded the same day that "Intuitive takes seriously and fully investigates all complaints, as it will do with the complaints raised by both Ms. Dirickson and Mr. Ebong." PSAF ¶ 47.

## X. Plaintiff's Claims

Plaintiff brings a five-count complaint. Count I alleges sex discrimination under disparate treatment and hostile work environment theories in violation of Title

VII of the Civil Rights Act of 1964; Count II alleges retaliation in violation of Title VII; Count III alleges sex discrimination under the Illinois Human Rights Act (IHRA); Count IV alleges retaliation under the IHRA; Count V alleges retaliatory discharge in violation of Illinois law; and Count VI asserts a violation of the Illinois Whistleblower Act. [1]. Defendant has moved for summary judgment on all counts. [130].

## ANALYSIS

### I. Sex Discrimination – Disparate Treatment

The Court begins with Plaintiff's sex discrimination claim under Title VII and the IHRA. Courts apply the well-established Title VII legal standard to IHRA discrimination claims. *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) (observing that the "legal standard is the same under" Title VII and the IHRA). Plaintiff may defeat summary judgment by proceeding under one or two cognizable frameworks for evaluating discrimination claims under the IHRA.

First, Plaintiff may proceed under the burden-shifting framework the Supreme Court developed in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case by showing that: "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021); *see also Chatman v. Bd. of*

*Educ. of City of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021). Once the plaintiff establishes a prima facie case, the burden then "shifts to the employer to offer a nondiscriminatory motive"; if the employer does this, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir. 2020), *reh'g denied* (July 31, 2020)).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit introduced an alternative to the *McDonnell Douglas* framework. *See Palmer v. Ind. Univ.*, 31 F.4th 583, 589 (7th Cir. 2022). Under *Ortiz*, this Court asks simply "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] . . . caused the discharge or other adverse employment action" at issue. 834 F.3d 760, 765 (7th Cir. 2016); *see also Nigro v. Ind. Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022). Under *Ortiz*, courts assess the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Lewis*, 36 F.4th at 760. The Seventh Circuit's decision in *Ortiz*, however, "did not alter '*McDonnell Douglas* or any other burden-shifting framework.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 766).

Here, Plaintiff does not proceed under the *McDonnell Douglas* framework, [150] at 16, so this Court will assess the evidence under the holistic *Ortiz* standard. Under *Ortiz*, Plaintiff must adduce sufficient evidence for a reasonable jury to conclude that her sex caused an adverse employment action. *Inojosa v. Bd. of Trustees*

23

*of City Colleges of Chi., Cmty. Coll. Dist. 508*, No. 20 C 1114, 2022 WL 4604578, at *4 (N.D. Ill. Sept. 30, 2022) (citing *Ortiz*, 834 F.3d at 765). Because there is no direct evidence of discrimination here, Plaintiff must present circumstantial evidence supporting an inference of intentional discrimination. As the Seventh Circuit has explained, "three broad types" of circumstantial evidence meet this burden: ambiguous or suggestive comments or conduct; better treatment of similarly-situated comparators; and dishonest employer justifications for disparate treatment. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020). Plaintiff contends she has sufficient evidence that Defendant took adverse employment actions—her termination, her PIP and FWW, her territory realignment—based on her sex. The Court considers each alleged adverse action below.

### A.    PIP/FWW Leading to Termination

Generally, a PIP or FWW, without more, does not qualify as an adverse employment action in the discrimination context. *See Leghari v. Wilkie*, No. 1:19-CV-360, 2022 WL 3700877, at *5 (N.D. Ind. Aug. 25, 2022) (noting that the Seventh Circuit has "strongly suggested" that a PIP will rarely—if ever—be an adverse employment action on its own) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996)). But here, the PIP and FWW is not "unaccompanied by [any] tangible job consequence," because in this case, it justified Plaintiff's discharge—an unquestionably adverse employment action. *Nwoke v. Univ. of Chi. Med. Ctr.*, No. 16 C 9153, 2020 WL 1233829, at *10 (N.D. Ill. Mar. 13, 2020) (alteration in original) (quotation omitted). Thus, although the PIP and FWW are not themselves adverse

employment actions, the Court "will consider the evidence" of these vehicles of "pre-termination scrutiny . . . to determine whether [they] support[] an inference that she was terminated for a discriminatory reason." *Id.* at *11.

Here, Plaintiff adduces several different pieces of circumstantial evidence that raise an inference that Defendant's disciplinary actions and subsequent termination were motivated by her sex. First, she points to evidence that at least one male ASM with performance issues received lesser forms of discipline. Defendant disciplined Plaintiff the first year she missed her sales quota—2017—by placing her on a PIP. In contrast, male ASM Chris Andrews—who reported to Ebong and Docter, like Plaintiff—ranked 26 out of 27 ASMs at the end of 2016 and only attained 60% of his quota. PSAF ¶ 30. Defendant did not give Andrews a PIP for missing his quota for that year. Rather, Defendant waited until the fall of 2018 before issuing Andrews a "Verbal Warning Letter," which according to Ebong, was "one step before" a PIP. [153-9] at 55; [133-12] ¶ 32 & pp. 16–18.

Plaintiff attempts to point to other male comparators to demonstrate that Defendant treated her male counterparts more favorably. She points to Brian Brant, an employee who had vague performance issues and was issued a warning, not a PIP, before resigning. PRSOF ¶ 63. Brant reported to Docter. [170] at 16. She does not detail the "performance issues," however, and thus does not demonstrate that Brant is a suitable comparator. *See Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 896–97 (7th Cir. 2018) (affirming grant of summary judgment because plaintiff provided insufficient evidence of similarly situated employees). Plaintiff also

25

contends that male employees Mike Hodgkiss and Kris Benson received lesser discipline for similar performance issues. [150] at 11. But as to these employees, Plaintiff does not present any evidence that they received discipline from Docter and/or Ebong, as she did. Hodgkiss and Benson therefore do not make for suitable comparators. *See Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (instructing that a similarly situated comparator must at least deal with the same supervisor); *Jasnic v. Bisco, Inc.*, No. 1:20-CV-02507, 2022 WL 971606, at *6 (N.D. Ill. Mar. 31, 2022) (holding that the absence of a shared disciplinary decision-maker with Plaintiff foreclosed a finding that five employees were similarly situated comparators).

Notwithstanding, Plaintiff has identified one male comparator, Andrews, whom the Defendant arguably treated more favorably in terms of discipline. The jury could draw an inference of discriminatory intent based on this evidence. *See Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 865 (7th Cir. 2015) (noting that "selective enforcement" can raise an inference of discrimination) (quotation omitted); *see also, e.g.*, *Principe v. Village of Melrose Park*, No. 20 CV 1545, 2022 WL 488937, at *10 (N.D. Ill. Feb. 17, 2022) (holding that "inconsistent disciplinary practices," among other pieces of evidence, supported the plaintiff's discrimination claim).

Plaintiff also adduces circumstantial evidence that Defendant gave a dishonest reason for disciplining her and ultimately terminating her. This dovetails with the comparator inquiry. That is, Defendant maintains that the reason it put her on a PIP and FWW and eventually terminated her was based solely on performance. The record supports this account: by the time Defendant put Plaintiff on the PIP, it

26

believed she was not performing well and had not succeeded on the 5 Pillars. And by the time Defendant terminated Plaintiff, Defendant believed Plaintiff did not make progress on the 5 Pillars and was not making sufficient sales. A jury could believe that Defendant disciplined and terminated Plaintiff because of her subpar work performance. Yet, as discussed, Plaintiff has offered countervailing "evidence that [Andrews, a male comparator] received better treatment . . . under similar circumstances" such that the Defendant's justifications for disciplining Plaintiff "lack trustworthiness." *Whitmore v. Wheaton Vill. Nursing & Rehab. Ctr., LLC*, No. 20 CV 1732, 2022 WL 1422754, at *6 (N.D. Ill. May 5, 2022). A jury could reasonably infer discriminatory intent based on the disparate treatment.

As additional evidence of discriminatory intent, Plaintiff offers an email she sent to Docter and Pastor on December 14, 2018, shortly before her termination. [133-69]. In that email, she discusses being ranked #31 out of 36 ASMs and forecasting five deals that will close in December. *Id.* Crediting Plaintiff's account, a jury could believe that Plaintiff's performance did not suffer as much as Defendant claimed it did and that Defendant's concerns about Plaintiff's performance were mere pretext for discrimination. *See Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 428 (7th Cir. 1992) (concluding that a jury could infer discrimination where an employer implemented a "subjective employment decision" contradicted by "objective evidence" of the plaintiff's capabilities).

Moreover, "behavior toward or comments directed at other employees in the protected group is one type of circumstantial evidence that can support an inference

of discrimination." *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020) (internal quotation marks and citation omitted); *see also Henderson v. Shulkin*, 720 F. App'x 776, 784 (7th Cir. 2017). Here, Plaintiff has pointed to evidence of other employees' experiences with a male supervisor, Adam Clark, who assaulted a female subordinate at work event in 2017. PSAF ¶ 10; DRSAF ¶ 10. Amanda C., Plaintiff's colleague, also claims to have been sexually harassed by a male employee at Adam Clark's house in 2017. [153-42]. Amanda C. claims that Adam Clark was a "serial predator" who harassed multiple women at the company, with the company taking no discipline against him. *Id.* ¶ 5. Amanda C. also claims that when she participated in the company's investigation of Clark in 2021, she believes she was retaliated against by the company in that a promotion that she was promised prior to her participation in the investigation was withdraw afterward. *Id.* ¶ 11. Amanda C. described in her 2022 resignation email that the company perpetuated a "misogynistic boys club in the sales organization" and explained that attending a national meeting "as a woman at this organization has always made me feel like a piece of meat." PSAF ¶ 25. This evidence regarding Defendant's mistreatment of other women supports an inference of discrimination. *See Vega*, 954 F.3d at 1005 (finding that "testimony that the Park District mistreated other Hispanic employees," such as that Hispanic supervisor was assigned to "rough" parks on purpose and that another employee retired after being told she and her staff were being watched, supported a reasonable inference of discrimination). For its part, Defendant argues that Amanda C.'s experience was different from Plaintiff's, and that it is not clear

whether they shared the same supervisors or decisionmakers. *See* [170] at 13. Thus, Defendant argues, Amanda C.'s experience sheds no light on Plaintiff's own experience. *Id.* While Defendant remains free to argue this to a jury, Amanda C.'s experience is not irrelevant, and it is "the jury's job to weigh" the evidence, "make credibility determinations, and evaluate the trial record based on its collective common sense." *Stragapede v. City of Evanston*, 865 F.3d 861, 866 (7th Cir. 2017), *as amended* (Aug. 8, 2017).

For these reasons, Plaintiff has raised a triable issue of fact on whether her PIP, FWW, and ultimate termination were discriminatory.

### B. Territory Realignment

Plaintiff also contends that Defendant's territory realignment was discriminatory. Defendant counters that the territory realignment does not qualify as an adverse action because it did not affect her base compensation nor her target commissions. [131] at 12. Plaintiff, however, maintains that her actual compensation suffered by more than a half a million dollars. PRSOF ¶ 32. Indeed, a lateral transfer that results in a reduction in pay can qualify as an adverse employment action. *See West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (noting that a reduction in compensation, fringe benefits, or other financial terms of employment qualifies as an adverse employment action under Title VII).

Notwithstanding, the record contains no facts suggesting that Defendant's territory realignment occurred due to Plaintiff's sex. The undisputed portions of the record show that Plaintiff ranked last of the ASMs in 2017, and that as a result,

Defendant decided to move sales for Northern Chicago from Plaintiff to Mark N., who sold to 200% quota in 2017. DSOF ¶¶ 27–29. Plaintiff does not fully develop this argument about the territory realignment. She argues that Defendant "has a pattern of taking accounts away from women and giving them to men," [150] at 25, but the exhibits upon which she relies to support this argument come from PSAF ¶¶ 7–8, which contain inadmissible hearsay statements from other female employees in their EEOC charges. Plaintiff thus fails to raise a triable issue that Defendant realigned her accounts based on her sex. Plaintiff cannot base her discrimination claim on this the territory realignment which does not constitute an adverse action.

## II. Retaliation

This Court next assesses whether Plaintiff raises a triable issue on her retaliation claim. This claim is somewhat difficult to discern. Plaintiff appears to assert that Defendant retaliated against her for lodging her internal discrimination complaints and ethics violation against Ebong, and that this retaliation manifested in a few different forms—termination, the PIP/FWW, "intense monitoring and heightened scrutiny" by Ebong and Docter, Ebong's "harassment and physical intimidation," Defendant's inadequate investigation into her complaints, Ebong's and Docter's negative field ride reports, Ebong excluding Plaintiff from communications and Docter condoning it, and Ebong's decision to limit her to just 10 accounts when she returned from medical leave.

To survive summary judgment on this claim, Plaintiff must present evidence of: (1) a statutorily protected activity; (2) a materially adverse action taken by the

employer; and (3) a causal connection between the two. *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022). The "evidence presented 'must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded." *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Ortiz*, 834 F.3d at 765). The inquiry boils down to one question: Does the record contain sufficient evidence to permit a reasonable factfinder to conclude that retaliatory motive caused the materially adverse action? *Id.* On the element of causation, Plaintiff must show that Defendant would not have taken the adverse action but for her protected activity. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Plaintiff can meet her burden on causation by presenting direct evidence of retaliation in the form of admissions, or alternatively, by pointing to circumstantial evidence, "including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of [retaliatory] intent might be drawn." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1118 (7th Cir. 2022); *see also Huff v. Buttigieg*, 42 F.4th 638, 646 (7th Cir. 2022). Defendant may rebut the inference of causation "with evidence of a nondiscriminatory explanation for the challenged action," after which the "burden returns to [Plaintiff] to show that the . . . nondiscriminatory explanation is pretextual." *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 634 (7th Cir. 2022).

Initially, not all of Plaintiff's alleged adverse actions qualify as materially adverse under Title VII. The Supreme Court cautions that "it is important to separate significant from trivial harms," and that Title VII "does not set forth a general civility code for the American workplace." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006)). For example, Ebong's threat to sue Plaintiff is not itself a materially adverse action; it is an "unfulfilled threat[ ] that result[ed] in no material harm" because Ebong did not ultimately pursue legal action and Plaintiff demonstrates no concrete harm stemming from that threat. *Id.* at 869 (noting that a threat that results in "no injury or harm greater than stress and worry" does not constitute an adverse action in itself, even if it can be probative to retaliatory intent behind a more concrete adverse action).

Similarly, Plaintiff's complaints that Ebong and Docter gave her harsh performance reviews after field rides do not amount to materially adverse actions. *Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty., Ill.*, No. 06 C 1462, 2007 WL 2875726, at *11 (N.D. Ill. Sept. 28, 2007) (noting that "negative performance evaluations alone cannot constitute a materially adverse employment action in the Seventh Circuit") (citing *Haywood v. Lucent Techs.*, 323 F.3d 524, 532 (7th Cir. 2003)). Nor does increased scrutiny or monitoring, *see Trimble v. All.-DeKalb/Rock-Tenn Co.*, 801 F. Supp. 2d 764, 775 (N.D. Ill. 2011), exclusion from communications by Ebong, *see Gupta v. City of Chicago*, No. 16 C 9682, 2017 WL 2653144, at *5 (N.D. Ill. June 20, 2017) (noting that "snubbing" from supervisors is not materially adverse), or Defendant's alleged failure to adequately investigate Plaintiff's

complaints, *see Kuhn v. United Airlines*, 63 F. Supp. 3d 796, 803 (N.D. Ill. 2014), *aff'd sub nom. Kuhn v. United Airlines, Inc.*, 640 F. App'x 534 (7th Cir. 2016); *Clemmer v. Off. of Chief Judge of Cir. Ct. of Cook Cnty. & State of Ill.*, No. 06 C 3361, 2008 WL 5100859, at *15 (N.D. Ill. Dec. 2, 2008) ("Clemmer may have preferred her employer to do more in its investigation, but its failure to conduct an inquiry to her satisfaction does not constitute an adverse action.").

Plaintiff also contends that Defendant's decision to limit her to just ten accounts following her medical leave does constitute an adverse employment action. [150] at 29. But the facts demonstrate that Plaintiff was not so limited. The exhibit she relies on to demonstrate this fact shows that, upon her return from medical leave, Docter emailed her a list of ten accounts and asked her to "include each of these targets and plans into your chessboard management tool." [153-18]. Docter followed up later to clarify that the "10 targeted accounts, and respective surgeons, provided to you last week, are the best pipeline management opportunities that need your focus in order to build out your mid and long term pipeline. By all means, if you would like to discuss the remaining 70 accounts if you feel there is an opportunity, I am certainly open to this." [167-49] at 3. Accordingly, the contemporaneous evidence does not corroborate Plaintiff's assertion that Defendant shut her out from other accounts.

The only remaining asserted actions are Ebong's alleged harassment and physical intimidation, the PIP/FWW, and the termination. The Court assesses those below.

### A.    Harassment and Intimidation

Plaintiff asserts that Ebong harassed and intimidated her in retaliation for her internal complaints. [150] at 29. "Harassment can constitute a materially adverse action for retaliation purposes" if "serious enough to dissuade a reasonable employee from engaging in protected activity." *Poullard v. McDonald*, 829 F.3d 844, 857–58 (7th Cir. 2016). Plaintiff can "assert that the collective harassment she experienced in retaliation amounted to an impermissible retaliatory action." *McCracken v. Indiana*, No. 1:19-CV-02290-JRS-MG, 2021 WL 4454113, at *17 (S.D. Ind. Sept. 29, 2021).

Viewed collectively, the record contains sufficient evidence that Ebong harassed Plaintiff for retaliatory purposes. Plaintiff offers her deposition testimony, for example, that during a field ride with Ebong on February 1, 2018 he berated, threatened, and screamed at her in the middle of a hospital cafeteria with customers around. [153-3] at 53. This harassment occurred shortly after Plaintiff initially complained about discrimination on January 5, 2018 when Ebong informed her that her accounts were to be reassigned to a male employee. A reasonable jury could find that, given the timing of events and Plaintiff's account of the interaction, which made her physically afraid, the harassment was materially adverse and was motivated by Plaintiff's complaint. *See Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012).

The record also contains evidence that Ebong harassed her for reporting his alleged ethics violation. On February 15, ten days after she made the ethics complaint about Ebong to ComplianceLine, Ebong emailed Pastor that he was "concerned with

her performance and pattern of dishonesty as hindrances to our business and damaging our culture" and asked Pastor and human resources to "address[ ] this with [Plaintiff] during the debrief." PSAF ¶¶ 42, 44. Plaintiff also produces evidence that, on February 26, 2018, she raised concerns with human resources that Ebong shut her out of conversations—specifically in his weekly reports. PSAF ¶ 37. Ebong also threatened to sue Plaintiff over her internal complaints, by sending a cease-and-desist letter from his attorney to Plaintiff's attorney while both remained employed at the company. [155-32]. While, as discussed above, these individual events may not themselves qualify as materially adverse, a reasonable jury could find that they amount to "collective harassment" that Ebong subjected Plaintiff to in retaliation for her complaints. *McCracken*, 2021 WL 4454113, at *17; *see, e.g.*, *Poullard*, 829 F.3d at 857 (noting that unfulfilled threats, though not actionable, "may well be relevant evidence of retaliatory intent behind a more concrete adverse action").

For these reasons, Plaintiff has raised a triable issue as to whether she experienced retaliatory harassment for engaging in protected activity.

### B. PIP/FWW and Termination

As with the discrimination claim, the parties dispute whether a PIP and FWW qualify as adverse actions in the retaliation context. As in the discrimination context, in the retaliation context, a PIP, "without more, does not rise to this level" of an adverse employment action. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016). It can, however, be "relevant evidence of retaliation" behind

a more concrete action—here, termination. *Id.* Thus, this Court will again analyze the PIP/FWW and termination together.

Defendant argues that the PIP, FWW, and subsequent termination was not retaliatory. A jury could certainly believe Defendant's argument, as the record demonstrates that Plaintiff suffered from multiple performance-related issues giving rise to the PIP, the FWW, and ultimately her termination. Leading up to the PIP and FWW, it is undisputed that in 2017, Plaintiff's performance suffered and at the end of the year, she was ranked 37th out of 37 ASMs and finished only 46% to quota. DSOF ¶¶ 22, 37. Upon the company's transition through which Ebong replaced Stoner as Plaintiff's supervisor, Stoner told Ebong that Plaintiff was struggling in the ASM job. [133-9] at 11–13. Stoner also told Ebong that "I felt like there was going to be some performance management that was going to be taking place if her and I were still aligned." *Id.* at 13. Docter took over Plaintiff's management at the end of February 2018. DSOF ¶ 47. During a field ride with Plaintiff in early March 2018, Docter concluded she needed to improve her application of the 5 Pillars sales strategy. [133-12] ¶ 24. As Docter explains in his declaration, Plaintiff did not reach out to a local team in another state with which they were coordinating; the slide decks she presented did not have commitment dates for the surgeons and hospitals, as required under Pillar 4; and the slide deck had information about the wrong Robot. *Id.* Docter also assessed that Plaintiff failed to effectively utilize and implement the first three of the 5 Pillars, such that when she would try to get to Pillar 5 (validations from a hospital's C-suite), she would suffer from not having done the legwork. *Id.* ¶ 25. On

March 8, 2019, Docter emailed Plaintiff about a specific meeting with executives and explained that Plaintiff's slide deck missed key information about a Robot and omitted dates of upcoming planned market events, and instructed it was important to have this information in a meeting with hospital executives and surgeons. *Id.* ¶ 26. The PIP issued on March 27, 2018 was intended to focus her efforts on the 5 Pillars. *Id.* ¶ 27. Docter issued Plaintiff a Final Written Warning (FWW) on April 27, 2018. DSOF ¶ 66. Docter attests that he did so because she did not make sufficient progress on the specific actions outline in her PIP after thirty days. [133-12] ¶ 34. These facts show that Defendant had legitimate work performance concerns with Plaintiff and placed her on the PIP and FWW due to those concerns.

But the record contains countervailing evidence raising an inference of retaliatory intent. Plaintiff offers evidence that she complained to Ebong on January 5, 2018 about gender discrimination, and that two days later, on January 7, 2018, Ebong recommended to Docter that the company should place Plaintiff on a performance plan, *see* [150] at 32; DSOF ¶¶ 33, 37, and Docter did eventually place Plaintiff on the PIP. This suspicious timing "can support an inference of a retaliatory motive." *Lesiv*, 39 F.4th at 920.

Moreover, as discussed above in analyzing Plaintiff's discrimination claim, Plaintiff has evidence that Defendant treated Chris Andrews more favorably. Based on the raw data, Andrews suffered from similar performance-related issues as Plaintiff but Docter did not put him on a PIP as quickly as it did Plaintiff, and did not terminate Andrews. Andrews did not raise any complaints of discrimination or ethics

violations, as Plaintiff did. *See, e.g.*, *Collins v. Village of Woodridge*, 96 F. Supp. 2d 744, 753 (N.D. Ill. 2000) (holding that evidence of a pattern of bad evaluations following the plaintiff's internal complaint, combined with evidence of a similarly-situated comparator who received more favorable treatment, sufficiently created a triable issue on causation in the retaliation context); *cf. Poullard*, 829 F.3d at 859 (affirming summary judgment on retaliation claim because the plaintiff did not identify a similarly situated comparator who the defendant treated more favorably and who did not engage in protected activity).

Additionally, it remains disputed whether Ebong influenced Docter's decisions to discipline and terminate Plaintiff. There is evidence, as discussed, that Ebong was angry about Plaintiff's complaints of discrimination and about his alleged ethics violation, from which a reasonable fact-finder could conclude that Ebong recommended the PIP to Docter in retaliation. And there is evidence that Ebong continued to influence Docter's management of Plaintiff: according to Plaintiff, even after she returned from medical leave, she remained on Ebong's team, and Docter continued to communicate with Ebong about Plaintiff's progress on her PIP. [133-2] at 90. There is also evidence that Ebong made misrepresentations about his communications with Plaintiff that caused Docter to perceive her in an unfavorable light. PSAF ¶¶ 39–40. Given this evidence that Ebong had Docter's ear, there is a genuine issue of material fact as to whether Defendant might be liable under a cat's paw theory of retaliation. *See Huff*, 42 F.4th at 647 (explaining that under the cat's paw theory of liability, an "employer may be liable for the retaliatory actions of a

subordinate who lacked formal decision-making power if the subordinate's actions were the proximate cause of the adverse employment action").

Construing the record in Plaintiff's favor, as this Court must on summary judgment, it finds that Plaintiff has produced evidence from which a jury could find retaliation.

### III.  Hostile Work Environment

The Court next analyzes whether Plaintiff establishes sufficient evidence to proceed on her hostile work environment theory.

To prove this claim, Plaintiff must show: (1) Defendant subjected her to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability. *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022); *Scaife*, 49 F.4th at 1115–16. The Court bears in mind that a hostile-work-environment claim is a single "unlawful employment practice" that includes every act composing that claim, whether those acts are independently actionable or not. *Green v. Brennan*, 578 U.S. 547, 557 (2016) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115–121 (2002)). Plaintiff bases her hostile work environment theory on a totality of circumstances, including overtly sexual comments; verbal harassment; being physically intimidated, berated in public, excluded from meetings and communications; and being held to unreasonable performance expectations not placed on men; being subjected to increased monitoring; and being threatened by legal action by Ebong. [150] at 23–24.

Defendant argues that Plaintiff has insufficient evidence on the second and third elements of a hostile work environment claim.

## A. Harassment Based on Sex

On the second element—whether Defendant subjected Plaintiff to harassment based on her sex—Defendant argues that Ebong and Docter did not harass her because she was a woman. [170] at 22. To be sure, the record demonstrates that Ebong's subordinates—men *and* women—had issues with his management style. One male ASM, Chris Andrews described Ebong as a "bully" who "pushes so hard that he makes people feel uncomfortable." DSOF ¶ 55. But "forms of harassment that might seem neutral in terms of race (or sex or other protected status) can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016). Superficially "neutral events" can contribute to a hostile work environment as part of "the entire context of the workplace." *Id.* (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002)). Plaintiff provides more context from which a reasonable juror could conclude that Ebong harassed her because of her sex. For instance, two other female co-workers, Lehmann and Steinhoff, provided testimony about their interactions with Ebong. Lehmann testified that Ebong leaned into her, causing her to be afraid for her physical safety. [153-15] at 13. Steinhoff testified that Ebong talked about the size of his genitalia at a work outing; and that he also made a comment about her wanting to leave the company and get married during a meeting. [153-16] at 10, 37–38. These

actions and comments evidence gender animus. Based on these pieces of evidence, a jury could reasonably view the allegedly harassing conduct as the product of hostility toward women. *See Hall v. City of Chicago*, 713 F.3d 325, 333 (7th Cir. 2013) ("If a supervisor treated all women hostilely, we generally permit an inference that the actor was motivated by their gender."); *see also, e.g., S.C. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 579 F. Supp. 3d 999, 1036 (M.D. Tenn. 2022) (noting that evidence that a "supervisor was abusive toward women more often than men" can support the inference that harassment was sex-based when it is facially gender-neutral); *see Sanderson v. Wy. Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (instructing that the jury ordinarily decides "whether facially sex-neutral conduct constitutes harassment based on sex").

Similarly, a reasonable jury could conclude that Docter's management of Plaintiff was based on her sex. As discussed above, Docter placed Plaintiff on a progressive discipline policy instead of allowing her a grace period as he did a similarly situated male comparator, Chris Andrews, and according to Plaintiff, subjected her to increased monitoring of her work performance, travel, and email accounts. Viewed in totality, this Court cannot say that there is no evidence that Docter's actions were not sex-based. *See Hall*, 713 F.3d at 331.

### B. Severe or Pervasive Harassment

Defendant also argues that Plaintiff's hostile work environment does not withstand summary judgment because she cannot show that the harassment toward her was objectively offensive, and thus, she cannot satisfy the "severe or pervasive"

prong of her claim. [170] at 22–24; *see Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) ("Ultimately, to satisfy the 'severe or pervasive' prong, the plaintiff must show that the work environment was both subjectively and objectively offensive."). This Court disagrees. Such inquiries are generally reserved for the jury. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) ("Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury."). Construing the evidence in her favor, the jury could reasonably find that the work environment Plaintiff complains of— consisting of verbal and physical intimidation by her supervisor, a culture of sexism toward women, and the imposition of more difficult standards for work performance compared to men—is sufficiently severe or pervasive to constitute an actionable hostile work environment.

For these reasons, this Court denies summary judgment on Plaintiff's hostile work environment theory.

## IV. Retaliatory Discharge

Next, Plaintiff asserts that Defendant fired her in retaliation for her reporting Ebong's attempt to bribe a doctor in violation of Illinois law. [150] at 34.

To survive summary judgment on an Illinois retaliatory discharge claim, a plaintiff set forth evidence that: "(1) the employer discharged the employee (2) in retaliation for the employee's protected activities, and (3) that the discharge was in contravention of a clearly mandated public policy." *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 571 (7th Cir. 2022). Defendant does not dispute that Plaintiff has

evidence of the first and third elements; instead, Defendant argues that Plaintiff cannot prove that her ethics complaint against Ebong caused Plaintiff's termination. [170] at 30.

For the same reasons as discussed above, this Court finds that Plaintiff has adduced sufficient evidence from which a jury could reasonably find that her ethics complaint against Ebong caused her termination. This Court therefore denies summary judgment on Plaintiff's retaliatory discharge claim. *See, e.g., Masud v. Rohr-Grove Motors, Inc.*, No. 13 C 6419, 2015 WL 5950712, at *8 (N.D. Ill. Oct. 13, 2015) (denying summary judgment on retaliatory discharge claim for the same reasons as the Title VII retaliation claim).

## V. Illinois Whistleblower Act

Finally, Defendant moves for summary judgment on Plaintiff's IWA claim. The IWA prohibits an employer from retaliating against an employee "for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/20. There "are two aspects to such a claim: (1) the refusal to participate; and (2) the violation of a statute, rule, or regulation." *Perez*, 31 F.4th at 574 (citing *Roberts v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 135 N.E.3d 891, 900–01 (Ill. 2019)).

Defendant argues that Plaintiff has no evidence that she refused to participate in Ebong's alleged bribe of the doctor. [170] at 30. This Court agrees. Under the IWA, refusing means refusing; "it does not mean 'complaining' or 'questioning.'" *Perez v. Staples Cont. & Com. LLC*, No. 16-CV-7481, 2020 WL 6448296, at *10 (N.D. Ill. Nov.

3, 2020) (quoting *Sardiga v. N. Tr. Co.*, 948 N.E.2d 652, 657 (Ill. App. Ct. 2011)); *see also, e.g.*, *Robinson v. Alter Barge Line, Inc.*, 513 F.3d 668, 670 (7th Cir. 2008) (explaining that the plaintiff did not refuse to participate in illegal activity under the IWA because he "was never invited to" engage in it). The evidence shows that Plaintiff reported Ebong's conduct by filing a formal report with a compliance hotline and participating in the subsequent investigation. There is no further evidence, however, that Ebong asked, and Plaintiff refused, to participate in the alleged bribe. This Court therefore grants summary judgment on Defendant on Plaintiff's IWA claim.

## CONCLUSION

For the reasons explained above, this Court grants in part and denies in part Defendant's motion for summary judgment [130]. All but Plaintiff's Illinois Whistleblower Act claim will proceed to trial. This Court notes that Plaintiff requests sanctions because she believes Defendant's motion for summary judgment is "frivolous." [150] at 36. This Court does not find Defendant's motion frivolous, and thus, denies Plaintiff's request.

E N T E R :

Dated: February 20, 2023

_____
MARY M. ROWLAND
United States District Judge

44